**STANDARD BRANDS, INC.**

v.

**Walter T. ZUMPE et al.**

**Civ. A. No. 66–769.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Jan. 11, 1967.

for a competitor engaged in the coffee and tea business principally in Louisiana and Tennessee and in the areas surrounding each of these states, and from disclosing confidential information and trade secrets learned during his employment.

Through what is known as its Chase and Sanborn Division, the plaintiff develops, processes, and manufactures coffee and tea products. It distributes these under advertised and well known brand names, such as Chase & Sanborn, Tender Leaf, Instant Chase & Sanborn, Instant Siesta Decaffeinated, Instant Tender Leaf Tea, and Instant Tender Leaf Iced Tea. The plaintiff conducts research in coffee and tea processes and products at research laboratories in New Orleans, Louisiana and Stamford, Connecticut. It operates a pilot plant in New Orleans, where it seeks to improve its coffee and tea products. It also operates a manufacturing plant in New Orleans where it makes all of the instant coffee sold by it throughout the nation.

Walter T. Zumpe, who is one of the defendants, began to work for Standard in 1946 as a shipping clerk. Although he has had no technical education,[1] he has a talent for dealing with people. He was promoted successively until in 1954 he was transferred to New Orleans where he became Plant Manager of Standard's Chase & Sanborn Production Division in New Orleans.

Because Zumpe's work afforded him access to information that Standard considered confidential, Zumpe signed two agreements, one in 1959 and the other in 1964. These agreements, similar in terms, provided that, in consideration of his employment by Standard, Zumpe agreed:

\*　\*　\*　\*　\*　\*

"2. That except as required in the performance of his duties to the Company, he will not disclose or use at any time during his employment any of the Company's manufacturing processes, techniques, types of machinery and

Ralph L. Kaskell, Jr., New Orleans, La., for plaintiff.

Thomas B. Lemann, New Orleans, La., for defendants.

## OPINION

RUBIN, District Judge.

A nationally known manufacturer of food and related products here seeks to enjoin a former employee from working

---

1. He was educated in the humanities and arts, with several years of music training.

equipment used together with improvements and modifications thereof, product formulae and ingredients, including raw materials used, discoveries, inventions, ideas, * * * projects or programs, customer lists or any information disclosed to him in confidence or any information held in secret by the Company, of which he became informed during the term of his employment with the Company; and

"3. That he will not disclose or use at any time after the termination of his employment any of the foregoing information which may be trade secrets or confidential information of the Company unless he shall first request and obtain the written consent of the Company."

As Plant Manager, Zumpe received reports from Standard's Research and Development laboratories covering the work being done by them. He also conferred from time to time with research and technical personnel regarding methods of production and areas of research in which they were engaged. The information that he received included trade secrets and confidential information as well as much that was routine.

The defendant, William B. Reily & Company, Inc., is a family firm engaged in the coffee and tea business and in the distribution of other food products. It operates a plant in New Orleans located only a few hundred yards from the plaintiff's plant. Its New Orleans plant specializes in coffee with chicory, which is marketed under the trade name "Luzianne." It also sells both roasted and instant pure coffee and tea under the trade names Arobrand and Crescent Club.

It has a subsidiary in Knoxville, Tennessee, which sells only roasted and instant pure coffee and tea products. Reily manufactures its own instant coffee. It purchases decaffeinated coffee and instant tea from other manufacturers.

Reily needed a Production Manager. It was particularly interested in finding someone who could work well with people. One of its executive officers heard favorable reports about Zumpe, looked him up, and, after a series of conferences, engaged him as Reily's Vice-President and General Manager in charge of production. His duties include coordination of production at both the Knoxville and New Orleans plants. He was hired principally as an executive and to take charge of production processes, not to engage in improvement of coffee or tea products, research, or new product development. But Standard contends that in seeking properly to discharge his duties for Reily Zumpe will inevitably disclose the secret and confidential information that he learned while working for Standard, and that he cannot so "compartmentalize his mind" as to avoid disclosure however good his intentions.

The legal problems created when an employer seeks to protect his trade secrets from disclosure by a former employee were familiar to judges long before they learned the delight of a fragrant cup of coffee. The Romans recognized an action for enticement to communicate business secrets.[2] But it was not until the end of the Third Century, one legend tells, that monks, fleeing persecution, escaped to the highlands of Abyssinia, across the Red Sea from Arabia, and by accident discovered the virtues of the coffee bean.[3]

2. Schiller, Trade Secrets and the Roman Law, 30 Columbia Law Review 837 (1930).

3. One story says that one night one of the shepherd fathers came pale and trembling to the monastery from his night vigil with the flock. He was convinced the sheep were bewitched because they were jumping and playing as if it were a spring morning. When the friar went to investigate, he found the animals romping in the moonlight instead of sleeping. Watching night after night, the friar at last learned that the sleeplessness resulted when the sheep ate the leaves and fruit of an unfamiliar shrub. When he picked the ripe, cherrylike fruit and chewed the seeds, he felt an unusual exhilaration and was wakeful. That at least is the way the tale is told in Comp-

The coffee purchased by the consumer is a blend, compounded usually by a secret formula to achieve that flavor and aroma the coffee maker considers his own. Courts have recognized the need for blending conflicting interests in trade secret cases, too, although they are still struggling with the proper adjustment of the balance between employer and employee.

■ An employer who discloses valuable information to his employee in confidence is entitled to protection against the use of these secrets in competition with him. But the employee who possesses the employer's most valuable confidences is apt to be highly skilled. The public is interested in the reasonable mobility of such skilled persons from job to job in our fluid society, which is characterized by and requires the mobility of technically expert persons from place to place, from job to job and upward within the industrial structure.[4] And the employee himself must be afforded a reasonable opportunity to change jobs without abandoning the ability to practice his skills.[5] The resolution of the issues in this case first requires determining how much Zumpe knows that can be properly considered Standard's "trade secrets or confidential information" as distinguished from those things that he has absorbed as part of his general managerial and professional background.

## NATURE OF THE INFORMATION IMPARTED TO ZUMPE

A part of the trial was held in camera because the plaintiff contended that the testimony would necessarily disclose its trade secrets. By agreement of the parties, when the testimony dealt directly with information that the plaintiff considered secret, all persons were excluded from the courtroom except a representative of the plaintiff, the plaintiff's counsel, Zumpe, defendants' counsel, and the reporter. In order to preserve the confidentiality of the record, the documents alleged to be secret were presented in envelopes which were separately sealed. When the testimony required an answer the plaintiff considered secret, the witness wrote it instead of answering orally so that the reply itself would not appear in the transcript. Finally, because the plaintiff contended that even after these efforts a clever competitor might piece together confidential information from other testimony, the transcript itself was ordered not to be disclosed to the public.

ton's Encyclopedia, verbo Coffee, page 426.

However fanciful the legend, Abyssinia and Arabia were the original home of the coffee shrub. By the 15th century, pilgrims to Mecca used to drink a brew made from roasted coffee beans to prevent drowsiness during religious services. From Arabia the practice passed to Constantinople, then to Venice, and then through Europe, spread with the aid of Turkish ambassadors. Ibid.

4. Warner, The Corporation in the Emergent American Society (1962).

5. A former employee is entitled to utilize even in competition with his ex-employer "any skill which he may have acquired in service. Thus the skill with which an iron worker can determine the exact moment for pounding molten iron, and the skill of the glass moulder in handling his tools, although the result of the master's directions, become part of the personality of the servant which he is entitled to use freely." Comment, page 225, §

396, Restatement of the Law of Agency, Second.

"There is undoubtedly * * * an important policy which 'encourages employees to seek better jobs from other employers or to go into business for themselves'. * * * But there is also a policy which is designed to protect employers against improper disclosures of information which their employees have received in confidence * * *. Our judicial decisions have faithfully sought to vindicate both policies by preserving to employees their unfettered right to leave their employment and use elsewhere their acquired skill and knowledge of the trade generally as distinguished, however, from any trade secrets imparted to them in confidence and which they must continue to honor as such. * * *" Sun Dial Corp. v. Rideout, 16 N.J. 252, 108 A.2d 442, 447 (1954). See also Sperry Rand Corp. v. Rothlein, 241 F.Supp. 549, 564 (Conn.1964), same case, 288 F.2d 245 (CA 2, 1961).

The defendant acquiesced in these efforts to maintain secrecy but it contended that relatively little of the information identified by the plaintiff as secret or confidential was truly either one or the other.

Standard offered evidence that Zumpe had received confidential information or trade secrets regarding each of the following:

1. Development of a new dry coffee concentrate.

2. Processes for aroma and flavor recovery.

3. Instant coffee extraction equipment, developmental in nature, to produce best balance between quality and yield.

4. Standard's processes specifically for instant coffee production, including aroma oil, extraction and foam control, and maintenance of flavorability.

5. Decaffeinization.

6. Instant tea processes.

7. New instant dry tea concentrate.

8. Process and equipment development for freeze drying.

9. Research and other reports.

Zumpe testified that he had received information in each of these areas, that he considered relatively little of it to be secret since he thought a good deal of it was known to technical experts in the trade, but that Standard did consider this information confidential. It is clear that Standard had spent a good deal of money to develop this information and made a major effort to prevent its disclosure. Copies of reports relating to these subjects were kept in locked cabinets. The documents were not available to employees generally. Standard thought the information was of value to its competitors—not only because of the information concerning successful experiments or other work underway, but

also because even the information about unsuccessful experiments had "negative value": a competitor who knew that a certain experiment had been fruitless could save the time and expense of repeating it.[6] In addition, the evidence is clear that in regard to development of new products, merely being able to offer the product first—a few weeks or months ahead of competitors—may give a food manufacturer a substantial advantage.

Defendants sought to minimize the value of this information in three ways:

First, they denied that much of it was of any interest to Reily. Thus, for example, they contended that Reily had no interest in developing a new dry coffee concentrate; therefore even if this information were secret, Reily had no interest in it.

Second, they sought to show that new product processes could be duplicated rapidly once a new product was marketed because competitors could buy the new product, analyze it, and repeat the process.

Finally, they sought to show that some of the information could be readily obtained elsewhere—through trade publications, equipment manufacturers, and other trade sources.

Nonetheless, the evidence is convincing that the information available to Zumpe in these nine areas is valuable, it is not readily available elsewhere, and, even if none of it is of present interest to Reily, the disclosure of the information would violate Zumpe's contract with Standard.

## INEVITABILITY OF DISCLOSURE

In his new position, Zumpe will be responsible for managing production. He will participate in deciding whether Reily should manufacture products or buy them elsewhere. It cannot be doubted that he will try to do the best job possible. Standard contends that, under these circumstances, Zumpe will inevi-

---

6. The point is merely peripheral here, and there is no need to decide it, but there is some doubt whether such negative values are protected as trade secrets. See Ellis, Trade Secrets, § 211, stating: "There Are No Property Rights in Knowledge of Mistakes to Be Avoided."

tably disclose some of the confidential information learned while he worked for Standard.

■ However, this conclusion is not warranted by the evidence. It is doubtless true that Zumpe may be tempted to use his confidential information to Reily's benefit, but, because of the nature of Reily's business, it does not follow that disclosure is inevitable. This conclusion is reached by considering each of the "confidential areas" separately and specifically. The evidence presented to the court indicates that the nature of Reily's business both with respect to pure coffee and coffee with chicory, instant and roasted, as well as with respect to tea, make it entirely possible for Zumpe to work for Reily for the two years estimated by Standard as the useful life of its confidential information without disclosing any of it.

By comparison with Standard, Reily is a small firm. It is not now engaged in new product research and does not intend to market a new dry coffee concentrate in the foreseeable future. (Confidential Group No. 1) It is conducting no experiments to improve aroma and flavor recovery. (Confidential Group No. 2) It is not engaged in experiments to improve its instant coffee extraction equipment. (Confidential Group No. 3) It has a working process of instant coffee production and it has no experiment underway to alter this nor any intention of doing so in the future. (Confidential Group No. 4) It purchases decaffeinated coffee from another manufacturer who uses its own process (Confidential Group No. 5), and it likewise purchases its instant tea. (Confidential Group No. 6) It is not interested in a new dry tea concentrate. (Confidential Group No. 7) It has no intention of engaging in freeze drying. (Confidential Group No. 8)

Reily therefore is not now engaged in work that would permit the ready application of the confidential information known to Zumpe. While Standard's witnesses testified that he would inevitably do his best whenever a problem came up because he is an able, ambitious man, the testimony that his disclosure of confidential information would be inevitable rests upon the conclusion that doing his best would entail disclosure of such information. This conclusion does not follow from the evidence presented.

Standard's brief sums up this testimony by saying that "Zumpe could not stand by and watch Reily's personnel use poor techniques, knowing the secret, more efficient, and newer techniques and know-how of Standard for processing instant coffee and tea." But this assumes first that Reily has poor techniques, a fact not proved, and secondly that the "newer techniques and know-how" can be applied to Reily's processes. The nature of the confidential information and the methods used by Reily in its operations do not justify these conclusions.

It is true that it is possible for Zumpe to use Standard's confidential information. For example, he might pass on knowledge of an improvement in decaffeinization learned from Standard to Reily's manufacturer. This however would be a conscious and deliberate act, not merely the inevitable result of normal efforts to do an efficient production job. And it would inevitably be detected. For Standard is now running periodic chemical analyses of Reily's products and will learn promptly of any change in their composition or method of manufacture.

## PROTECTION OF CONFIDENTIAL INFORMATION

Various efforts have been made to define what is a "trade secret."[7] The

7. One case defines the term merely as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Hulsenbusch v. Davidson Rubber Co., 344 F.2d 730, 734 (CA 8–1965). In other cases, the term has been defined as meaning a secret known only to certain individuals using it as distinguished from "the mere privacy with which an ordinary commercial business is carried on." Glucol Manufacturing Co. v. Schulist, 239 Mich. 70, 214 N.W. 152 (1927).

tests applied include: (a) Is the information a secret not generally known to the trade?[8] (b) Although absolute secrecy is not essential, has it been kept at least a qualified secret?[9] (c) Is it of value?[10]

Even in the absence of a contract not to disclose confidential information, an agent has a duty not to use or communicate information given to him in confidence in competition with or to the injury of the principal unless the information is a matter of general knowledge.[11] The agent has a duty after the termination of the agency "not to use or to disclose to third persons, on his own account or on account cf others, in competition with the principal or to his injury, trade secrets * * * or other similar confidential matters. * * * " [12] The Restatement of the Law of Agency indicates that these rules apply "not only to those communications which are stated to be confidential, but also to information which the agent should know his principal would not care to have revealed to others or used in competition with him. It applies to unique business methods of the employer, trade secrets, lists of names and all other matters which are peculiarly known in the employer's business." [13]

Trade secrets and confidential information are protected on the basis that their wrongful disclosure is a breach of trust.[14] In the present case Zumpe would in addition violate his contract with Standard by disclosing any information imparted to him in confidence. Therefore it is unnecessary to determine which of the types of information listed above is technically a trade secret. All of it is confidential, all of it was imparted to Zumpe in the belief that it was confidential, and all of it should be held in confidence by him.[15]

The controlling principle was aptly stated years ago in Tabor v. Hoffman, 118 N.Y. 30, 36, 23 N.E. 12, 13 (1889):

"If a valuable medicine, not protected by patent, is put upon the market, any one may, if he can by chemical analysis and a series of experiments, or by any other use of the medicine itself, aided by his own resources only, discover the ingredients and their

8. Barton, A Study in the Law of Trade Secrets, (1935) 13 Univ. of Cincinnati Law Review, 507, 515.

9. Ibid, 518.

10. See Ellis, Trade Secrets, § 211.

11. Restatement of the Law of Agency, Section 395.

12. Ibid, Section 396.

13. Ibid, Comment to Section 395 at page 222.

14. Although the earlier cases dealt with the protection of trade secrets in terms of protection of a property right, it is recognized that the essence of the action is breach of faith. Franke v. Wiltschek, 209 F.2d 493 (2d Cir. 1953).

15. Even if information is available elsewhere, it is a breach of faith for the former employee to disclose knowledge gained by him in confidence in violation of the trust under which it was imparted. The use of information obtained in violation of a confidential relationship may be enjoined despite the fact that the defendant could have secured the knowledge from other sources. Franke v. Wiltschek,

209 F.2d 493 (2d Cir. 1953). See also Seismograph Service Corp. v. Offshore Raydist, Inc., 135 F.Supp. 342, 354 (E.D. La.1955), affirmed 263 F.2d 5 (5th Cir. 1959); Junker v. Plummer, 320 Mass. 76, 67 N.E.2d 667, 165 A.L.R. 1449, citing 4 Restatement, Torts § 757 and comment a (1939); Peabody v. Norfolk, 98 Mass. 452; Vulcan Detinning Co. v. American Can Co., 72 N.J.Eq. 387, 67 A. 339, 12 L.R.A.,N.S., 102; Tabor v. Hoffman, 118 N.Y. 30, 23 N.E. 12, 16 Am.St.Rep. 740; Spiselman v. Rabinowitz, 270 App.Div. 548, 61 N.Y.S.2d 138, appeal denied 270 App.Div. 921, 62 N.Y.S.2d 608; Extrin Foods, Inc. v. Leighton, 202 Misc. 592, 115 N.Y.S.2d 429. See also Smith v. Dravo Corp., 7 Cir., 203 F.2d 369; Schreyer v. Casco Products Corp., 2 Cir., 190 F.2d 921, certiorari denied 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683; 4 Restatement, Torts § 757 and comment a (1939); Nims, The Law of Unfair Competition and Trade-Marks §§ 141, 143a, 148 (4th Ed. 1947) ; Note, Protection and Use of Trade Secrets, 64 Harv.L.Rev. 976, 979, 982; cases collected in annotated note 170 A.L.R. 449, 488, 490.

proportions. If he thus finds out the secret of the proprietor, he may use it to any extent that he desires without danger of interference by the courts. But, because this discovery may be possible by fair means, it would not justify a discovery by unfair means, such as the bribery of a clerk who, in the course of his employment, had aided in compounding the medicine, and had thus become familiar with the formula."

## INJUNCTION AGAINST WORKING FOR A COMPETITOR

Since Zumpe has confidential information imparted to him by Standard which he has a duty not to disclose, but its disclosure is not the inevitable result of Zumpe's employment by Reily, the next question is whether an injunction should be granted against his working for Reily, or, as Standard now seeks by restricting its demand in its brief, against his employment in any capacity involving responsibility for the production of instant tea or coffee. Jurisdiction rests upon diversity of citizenship. 28 U.S.C. § 1332. Accordingly, we must draw the controlling principles of substantive law from the law of Louisiana. Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Whether the remedy of injunction is available is likewise determined by Louisiana law.[16] The courts of Louisiana have not yet, however, decided the specific issues presented here, and this court therefore faces "the pretentious task of anticipating the result most likely to be reached by a court of that state if presented with the same question." Bonner v. Williams, 370 F.2d 301 (5th Cir. 1966).

Louisiana has set forth its policy regarding agreements not to compete in clear terms. LSA–R.S. 23:921 provides that:

"No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or any provisions thereof, containing any such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years."

While the statute in terms condemns as null only contracts not to compete, the policy underlying the statute would similarly strike with invalidity an agreement not to work for another employer in a particular department of his business. If it were valid to enter into an agreement

---

16. See Black and Yates, Inc. v. Mohogany Assn., Inc., 129 F.2d 227, 148 A.L.R. 841 (3rd Cir. 1942), cert. den. 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539; Mintzer v. Arthur L. Wright & Co., Inc., 263 F.2d 823, 826 (3rd Cir. 1959). And see also 2 Moore's Federal Practice (2d Ed.) 454 § 2.09.

This was the conclusion rendered in a slightly different context by the Second Circuit Court of Appeals in Franke v. Wiltschek, 209 F.2d 493 (2d Cir. 1953) which observed:

"Remedies might be held procedural and thus subject to the law of forum except for the reminder that the question is not merely that, but rather 'does it signficantly affect the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court?' Guaranty Trust Co. of New York v. York, 326 U.S. 99, 109, 65 S. Ct. 1464, 1470, 89 L.Ed. 2079, 160 A.L.R. 1231."

not to work for another employer in that specific department or area most likely to injure the previous employer, or to afford employment opportunity to the former employee, the area in which the statute operates most effectively could be readily circumvented.

In this case Standard suggests that Zumpe has general managerial skills and that an injunction against his employment in the areas of instant coffee and instant tea research, processing and manufacturing would not unduly restrict his employment opportunities "in the instant coffee and tea business in any non-sensitive area like sales, personnel or even in coffee plants devoted solely to roasting and grinding coffee; nor from working in Reily's (or other competitors) chemical, salad oil, or general food divisions as plant manager, production executive or in any other position."

But there can be no doubt that Zumpe is peculiarly well qualified to handle production work in the coffee and tea business. Even an injunction limited in the manner thus sought by Standard would enforce at least in part a contract not to compete and would prevent Zumpe from working in the "field for which he is particularly fitted." [17]

■■■ Louisiana courts have consistently interpreted Section 921 as stating a broad policy against the validity of noncompetition agreements by employees.[18] Thus the Louisiana Courts have spoken of the statute as a "declaration of public policy by our Legislature against restrictions on the spirit of free labor." [19]

In National Motor Club v. Conque, 173 So.2d 238 (3rd Cir. 1965), cert. den. 247 La. 875, 175 So.2d 110 (1965), the Louisiana Court of Appeal observed:

"Even prior to the enactment by Act 33 of 1934 of this prohibition against exaction of noncompetitive agreements from employees, they were consistently held to be unenforceable. Cloverland Dairy Products v. Grace, 180 La. 694, 157 So. 393 (1943); Blanchard v. Haber, 166 La. 1014, 118 So. 117 (1928). See 27 Tul.L.Rev. 364 (1953). (In most states other than Louisiana, however, noncompetitive contracts are recognized if reasonably restricted as to time and area. See Annotations at 41 A.L.R.2d 15 and 43 A.L.R.2d 94.) In the absence of an enforceable contract to other effect, an employee has the absolute right to actively serve a business competing with his former employer after leaving the latter's service, Jones v. Ernst & Ernst, 172 La. 406, 134 So. 375 (1931); as, for instance, does a former officer who actively competes with his former corporate principal, Marine Forwarding & Shipping Co. v. Barone, La.App. Orl., 154 So.2d 528 (1963).

As noted in these decisions, their essential basis is the right of individual freedom and of individuals to better themselves in our free-enterprise society, where liberty of the individual is guaranteed. A strong public policy reason likewise for holding unenforce-

17. See Rabinowitz v. Dasher, 82 N.Y.S.2d 431 (1948) in which the defendant employee had contracted not to become engaged in the hook and eye tape business with a competitor following his employment. The court nevertheless refused to grant an injunction, because "Dasher has spent the last twenty years of his life in the hook and eye tape business. For many years prior to that he was either in the hook and eye business or in the somewhat related business of sewing machines. For this court to enjoin him for the next eight years from engaging, directly or indirectly, in the only field for which he is particularly fitted, would be a decree so unjust and oppressive as to mock the name, 'Court of Equity.' "

18. See Nelson v. Associated Branch Pilots, La.App., 63 So.2d 437 (1st Cir. 1953); Baton Rouge Cigarette Service, Inc. v. Bloomenstiel, 88 So.2d 742 (1st Cir. 1956); Marine Forwarding & Shipping Co. v. Barone, La.App., 154 So.2d 528 (4th Cir. 1963); Nalco Chemical Co. v. Hall, 237 F.Supp. 678, affirmed 347 F.2d 90 (5th Cir. 1965).

19. See Marine Forwarding & Shipping Co. v. Barone, 154 So.2d 528 (4th Cir. 1963).

able an agreement exacted by an employer of an employee not to compete after the latter leaves his employment, is the disparity in bargaining power, under which an employee, fearful of losing his means of livelihood, cannot readily refuse to sign an agreement which, if enforceable, amounts to his contracting away his liberty to earn his livelihood in the field of his experience except by continuing in the employment of his present employer."

██ The text of the Louisiana statute and the public policy which it embodies with respect to the invalidity of restraints upon the freedom of a former employee to compete with his ex-employer would prevent an injunction against working for a competitor however limited.

In Delta Finance Company of Louisiana, Inc. v. Graves, 180 So.2d 85 (2d Cir. 1965) the Louisiana Court of Appeal for the Second Circuit held enforceable an agreement by an employee not to solicit customers of his employer, in competition with his employer for a period of three years after the termination of his employment. The Court observed that, "[C]ontractual provisions which merely restrict the employee's activity as to certain particulars of the employer's business should be respected." However, the Court noted that "[T]he effect of these provisions is to prohibit Graves from pirating or taking direct steps to secure

and injure the business of the former employer, Delta. It does not prevent him from utilizing his training or competing with other similar businesses."

██ The plaintiff urges that in states in which, like Louisiana, there is a legislative declaration that noncompetition agreements are void, the courts have recognized that judicial restraint against the nondisclosure of trade secrets is outside the legislative prohibition.[20] There can be little doubt that Louisiana courts would in a proper case enjoin the disclosure of trade secrets in violation of a fiduciary or contractual obligation to maintain their secrecy.[21] However, that does not mean that Louisiana would sanction an injunction against working for a competitor because the new job entails the possible disclosure of trade secrets. While it does not appear here that the disclosure of confidential information by Mr. Zumpe will inevitably result from his employment by Reily, even if this were the consequence, no remedy could be afforded. For Louisiana has made a legislative determination, binding on this court as it is on the courts of Louisiana, that prevents enforcement even of an express covenant not to compete, let alone an implied obligation not to do so. If this imperils the ability of manufacturers having plants in Louisiana to insulate their trade secrets, that is the result of Louisiana's policy to protect the employee from what it considers to be an improper

20. Citing Gordon v. Landau, 49 Cal.2d 690, 321 P.2d 456 (1958), and Glucol Mfg. Co. v. Schulist, 239 Mich. 70, 214 N.W. 152 (1927). These cases do not deal with the validity of an injunction against working for a competitor. In Gordon v. Landau, the Court enforced an agreement not to solicit customers of the former employer and held that this did not violate a California statute rendering void "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business." The Court said that the employee was free to engage in a competing business but could not use his former employer's confidential lists in doing so. In the *Glucol* case, the defendant was enjoined from using his former employer's secret formulas for

the manufacture of paste. He was not enjoined from competing with the former employer. These cases are thus entirely consistent with the decision in Delta Finance Company of Louisiana v. Graves, 180 So.2d 85 (2d Cir. 1965).

21. See, for example, Martin-Parry Corporation v. New Orleans Fire Detection Service, 221 La. 677, 60 So.2d 83 (1952) in which the Court held enforceable a contract prohibiting a former employee from persuading other employees and customers of the employer to discontinue their relationship with the plaintiff-employer and become engaged in business with the ex-employee. See also Brown & Root v. LaBauve, 219 F.Supp. 179 (W.D.La.1961), affirmed 319 F.2d 582, 583 (5th Cir. 1963).

bargain even where he has expressly covenanted not to compete.

 Standard urges in the alternative that Zumpe should be enjoined from working for Reily because this would be "within the expense and advertisement exceptions of Section 921." The decision of this court in Nalco Chemical Company v. Hall, 237 F.Supp. 678 (E.D.La.1965), affirmed 347 F.2d 90 (5th Cir. 1965), appears to be a proper interpretation of the statute.[22] This decision makes it clear that the exceptions contained in Section 921 do not benefit Standard. Judge West there observed:

"These exceptions are obviously designed to allow an employment contract to contain a limited provision not to compete if the employer has expended money for training an employee not usually or customarily expended in the normal type employment. In other words, it seems quite clear that the intent of this exception is to protect an employer, to a limited extent, in cases where the employer has furnished and paid for special training whereby the employee is, by virtue of such expenditure by the employer, made a specialist in the employer's employ. The exception is not intended to cover the usual and customary expenses incurred in acquainting a new employee with his duties.

"As to the exception contained in the statute pertaining to expenses of advertising, this Court also believes that the intent is clear. It seems obvious that such expenses of advertising, in order to fall within the exception contained in the statute, must necessarily pertain in some way at least to the employee's connection with the employer's business. Where the expense of advertising is limited to the normal advertising of the employer's business and products, without any reference to the employee's connection therewith, it is difficult indeed to see how the exception in the statute could apply. If the Court were to hold that any expenses incurred in training an employee, and any expenses incurred in advertising the business, even though such advertising expenses had no reference to the employee's connection with the business, would bring the case within the exceptions contained in the statute, then the Court would, in effect, be reading out of the statute all but the exceptions. This is necessarily true because it is almost impossible to conceive of a situation where a new employee is not, at first, an expense to the employer, and it is equally difficult to conceive of a business today that does not incur some expense of advertising."

Standard presented no evidence that it had spent any money to train Zumpe in any way or that it had advertised his connection with it in any manner. Indeed it is obvious that Standard has devoted its efforts to advertising its trade names and products and not its employees. It cannot qualify under the exceptions in Section 921.

Nor does it benefit the plaintiff that in Louisiana an agreement not to compete ancillary to the lease or sale of a business is enforceable. See Moorman &

22. As noted by the Court of Appeals for the Fifth Circuit, Louisiana courts have adopted different interpretations of the statute. "The first agreed with the position taken by the appellant here that all the statute requires is that the employer incur some expense in training the employee or that he incur some expense in advertising his business, whether or not it pertains to the employee's connection with the business. Aetna Finance Co. v. Adams, 170 So.2d 740 (C.A. of La. 1st Cir. 1964, cert. den. by La.Sup.Ct., 247 La. 489, 172 So.2d 294). The sec-ond agreed with the district court's construction in this case, National Motor Club of Louisiana, Inc. v. Conque, 173 So.2d 238 (C.A. of La. 3rd Cir. 1965, cert. den. by La.Sup.Ct., 247 La. 875, 175 So.2d 110). The Supreme Court of Louisiana having denied the application for certiorari in each case on the grounds that the judgment was correct, the two decisions provide little guidance to the Erie-bound [Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188] court in determining Louisiana law on this point."

Givens v. Parkerson, 127 La. 835, 54 So. 47 (1911); Ullman & Co. v. Levy, 172 La. 79, 133 So. 369 (1931). See also Note (1951) Obligations—Agreements in Restraint of Competition, 11 La.L.Rev. 383; Note (1953) Contracts—Restrictive Covenants—Agreements Not to Compete, 27 Tul.L.Rev. 364. There is a basic economic difference between an agreement not to compete entered into by a businessman selling his business, and an agreement not to compete exacted by an employer of his employees as a term of employment. In the case of the buyer and seller, the bargaining abilities of the parties are relatively equal, each party to the transaction can protect his own interests, and the price paid for the business may well reflect the true value of the agreement not to compete. In the case of an agreement exacted of an employee by his employer, the Louisiana Legislature presumably felt that the inequality of bargaining ability, the lack of additional consideration for the contract not to compete, and the societal interest in employee mobility made it desirable to proscribe the employee contract even though other agreements not to compete remained enforceable.

## INJUNCTION AGAINST DISCLOSURE OF CONFIDENTIAL INFORMATION

Eliminating then the other issues that are stripped from the case by the factual and legal conclusions thus reached, we are confronted with the ultimate problem: Should an injunction be issued preventing disclosure of Standard's confidential information by Zumpe and its use by Reily? Should disclosure alone be enjoined?

It is hornbook law that injunctive relief is an unusual remedy, available only in those instances in which the rights of the parties cannot be otherwise adequately protected.[23] The issuance of an injunction is not justified by the mere fact that irreparable harm may possibly ensue if restraint is not imposed.[24] The plaintiff must make out a case for the issuance of the injunction by demonstrating that there is a clear present need for it.[25] Injunctions will not be issued merely to allay the fears

23. Walling v. Gulf States Paper Corp., 143 F.2d 301 (5th Cir. 1944); United States v. Board of Education of Green County, Miss., 332 F.2d 40 (5th Cir. 1964); Frostie Co. v. Dr. Pepper Co., 361 F.2d 124 (5th Cir. 1966); McComb v. Goldblatt Brothers, Inc., 166 F.2d 387 (7th Cir. 1948); Walling v. T. Buettner & Co., 133 F.2d 306, 308 (7th Cir. 1943). See also Amacker v. Amacker, 146 So.2d 672 (La.App.1962); Ricou v. International Paper Company, 117 F.Supp. 128 (D.C. La.1953); Chapital v. Walker, 30 So.2d 150 (La.App.1947). Louisiana courts appear to follow the same principle. See Mansfield Northeastern R. R. Co. v. Nabors, 135 La. 807, 66 So. 229 (1914) and Jackson v. Walton, 2 La.App. 53 (2d Cir. 1925).

24. Congress of Racial Equality v. Douglas, 318 F.2d 95 (5th Cir. 1963); see also Blease v. Safety Transit Co., 50 F.2d 852 (4th Cir. 1931); Aerated Products Co. v. Department of Health, 159 F.2d 851 (3rd Cir. 1947). In United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), the Court said, "But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." See also Thomas v. Orangeburg Theatres, Inc., 241 F.Supp. 317 (E.D.S.C.1955).

25. See State ex rel. Keiffer Bros. v. Judge of Civil District Court for the Parish of Orleans, 34 La.Ann. 89 (1882) in which the Court said, "Injunctions are only designed to prevent an actual or impending injury. * * *"

In Truly v. Wanzer, 46 U.S. 141, 5 How. 141, 12 L.Ed. 88 (1847), the U. S. Supreme Court stated that "There is no power, the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing of an injunction. It is the strong-arm of equity, that never ought to be extended, unless to cases of great injury, where courts of law cannot afford an adequate and commensurate remedy in damages. The right must be clear, the injury impending, and threatened so as to be averted only by the protecting preventive process of injunction."

and apprehensions or to soothe the anxieties of the parties.[26] Nor will an injunction be issued "to restrain one from doing what he is not attempting and does not intend to do." [27]

These rules, applicable generally to injunctive relief have been applied to the issuance of injunctions sought to prevent the disclosure of confidential information and trade secrets.[28] It has been frequently held that damages are not an adequate remedy for the improper disclosure of confidential information.[29] When Louisiana courts have been presented with questions relating to improper disclosure of confidential information and when it was not necessary to enjoin working for a competitor, they have followed the same principles apparently followed generally in this area in other states.[30] Therefore it is appropriate to refer to the principles that have been generally applied in the United States with respect to the propriety of issuance of an injunction.

■■■ What is entitled to protection is "knowledge confidentially gained" but "an employer cannot prevent his employee from using the skill and intelligence acquired through experience received in the course of the employment. The employee may achieve superiority by every lawful means and upon the rightful termination of his contract use that superiority for the benefit of rivals in business of his former employer." [31] In Sarkes Tarzian Inc. v. Audio Devices Inc., 166 F.Supp. 250, 262, 278–79 (S.D. Cal.1958), the Court said:

"Of necessity, whenever a change of employment of this type occurs and former employees enter into the employ of another with whom they engage in a competitive business, it is inevitable that some of the knowledge acquired while in the employ of the other should be made available to the new employer. But, as already appears, the courts will not deprive the employee of the rights to use the skill he developed through the years. * * *

"This has never been interpreted to prevent the employee from using the knowledge he has acquired while in one man's employ after he leaves that employ. The law does not require the employee to make a tabula rasa of his mind, by erasing from it the knowledge he has acquired."

See also Midland-Ross Corporation v. Yokana, 293 F.2d 411 (3rd Cir. 1961).

■■ On the other hand, the employer is entitled to injunctive relief to protect the disclosure of trade secrets or confidential information after an ex-employee

---

26. Dyer v. Securities and Exchange Commission, 291 F.2d 774 (8th Cir. 1961); Congress of Racial Equality v. Douglas, 318 F.2d 95 (5th Cir. 1963); Worthington Pump and Machinery Corp. v. Douds, 97 F.Supp. 656 (D.C.N.Y.1951); Leland v. Morin, 104 F.Supp. 401 (D.C.N.Y. 1952); Gainey v. Folkman, 114 F.Supp. 231 (D.C.Ariz.1953). A Louisiana court phrased the rule slightly differently:
"There must be at least a reasonable probability that the injury will be done if no injunction is granted, and not a mere fear or apprehension."
Jackson v. Walton, 2 La.App. 53 (2d Cir. 1935).

27. Blease v. Safety Transit Co., 50 F.2d 852 (4th Cir. 1931); Virginia Electric Power Co. v. NLRB, 115 F.2d 414 (4th Cir. 1940); Aerated Products Co. v. Department of Health, 159 F.2d 851 (3rd Cir. 1947); New Standard Pub. Co., Inc. v. FTC, 194 F.2d 181 (4th Cir. 1952).

28. See Ellis, Trade Secrets, §§ 85 and 86. See also Seismograph Service Corp. v. Offshore Raydist, 135 F.Supp. 342 (E.D.La.1955), affirmed 263 F.2d 5 (5th Cir. 1959); applying general equitable principles to a trade secrets case. In Marine Forwarding & Shipping Co. v. Barone, La.App., 154 So.2d 528 (4th Cir. 1963), the Restatement of Agency was cited with approval.

29. American Dirigold Corp. v. Dirigold Metals Corp., 125 F.2d 446, 452 (6th Cir. 1942). See also cases cited in Note (1965) "Injunctions to Protect Trade Secrets—The *Goodrich* and *DuPont* Cases," 51 Va.L.Rev. 917.

30. See cases in Notes 18, 19, 20 and 21.

31. Official Aviation Guide v. American Aviation Associated, Inc., 150 F.2d 173, 178 (7th Cir. 1945), cert. den. 326 U.S. 776, 66 S.Ct. 267, 90 L.Ed. 469.

has disclosed them or threatened to do so.[32] However, it is obvious that an injunction issued only after an actual disclosure has occurred locks the door after the horse is out. May an injunction be issued if, as here, the ex-employee is by the testimony of his ex-employer an honest and honorable man who performs his obligations, has not yet disclosed any confidential information, has not threatened to do so, and has asserted that he will carefully maintain the confidence reposed in him?

An employer seeking injunctive protection for his trade secrets prior to their disclosure generally alleges either that the ex-employee actually intends to divulge the secrets, or that he will inevitably do so, whether consciously or not, because of the type of work in which he will be involved, or that there is a substantial probability of disclosure.[33] Here, the claim of intention to disclose is not made and the facts do not support the claim that disclosure is inevitable. An injunction could be issued only on the basis of the possibility or probability of disclosure and the irreparable injury that would result if there were such disclosure.

■ Even after full consideration of the irreparable harm that may result from disclosure of confidential information, there appears to be no reason to depart in such cases from the rules applicable to the issuance of injunctions generally.

■ Nor is the case put in a different light because of the existence here of an express agreement not to reveal trade secrets or confidential information.[34] A duty not to disclose trade secrets will usually be implied from the employment relationship.[35] The existence of the covenant not to disclose merely makes enforcement by injunction available upon a showing that if the employee accepts his intended position he will break the covenant.[36] In other states, the difficulties implicit in employer enforcement have led to the use of a covenant not to compete.[37] But this device is not of course available in Louisiana—either directly or, as set forth above, by necessary inference.[38]

■ Two recent cases have involved the problems implicit in enjoining disclosure prospectively. Such suits have been comparatively rare [39] and it has been usually considered that, "if there has been no actual disclosure, the employer must prove that there is a sub-

---

**32.** See Franke v. Wiltschek, 209 F.2d 493 (2d Cir. 1953) and cases cited in Note (1965) "Injunctions to Protect Trade Secrets—The *Goodrich* and *DuPont* Cases," 51 Va.L.Rev. 917, 925, note 35. See also Restatement of Agency, Second, comment (f) § 397, page 233. In addition, other forms of relief are of course available, including compensatory damages and an accounting for profits. See 51 Va.L. Rev. 917, 923–924.

**33.** See Note (1965) "Injunction to Protect Trade Secrets—The *Goodrich* and *DuPont* Cases," 51 Va.L.Rev. 917.

**34.** See generally 6A Corbin, Contracts § 1394 (1962); Ellis, §§ 83–117; Blake, Employee Agreements Not To Compete, 73 Harv.L.Rev. 625 (1960); Annot., 43 A.L.R.2d 94, 185–207 (1955).

**35.** 1 Nims, Unfair Competition and Trade Marks, § 150 (4th Ed. 1947) and Restatement of the Law of Agency, Second, §

395. See also cases cited in Note 80, "Injunctions to Protect Trade Secrets— The *Goodrich* and *DuPont* Cases," 51 Va.L.Rev. 917, 931.

**36.** Irvington Varnish & Insulator Co. v. Van Norde, 138 N.J.Eq. 99, 46 A.2d 201 (Ct. & App.1946).

**37.** Barton, A Study on The Law of Trade Secrets, 13 U. of Cinn.L.Rev. 507, 551 (1939); Kalinowski, Key Employee and Trade Secrets, 47 Va.L.Rev. 583 (1960). See Blake, Employee Agreements Not to Compete, 73 Harv.L.Rev. 625 (1960) in which the author suggests "counseling and drafting techniques which may enable the employer to be more effectively protected against the former employee's utilization of confidential information."

**38.** "Injunctions to Protect Trade Secrets— The *Goodrich* and *DuPont* Cases," 51 Va.L.Rev. 917, 931 (1965).

**39.** Ibid, 933.

stantial threat of imminent disclosure."[40] Ellis, Trade Secrets, puts it this way: "Opportunity to do wrong and a suspicion that wrong will be done is not enough to warrant action by a court to prevent such wrong. Actual or threatened invasion of rights must be shown."[41]

In B. F. Goodrich Co. v. Wohlgemuth, 117 Ohio App. 493, 192 N.E.2d 99 (1963), Goodrich sought to enjoin Wohlgemuth from performing any work on high-altitude pressure suits for any of its competitors. The state appellate court, reversing the trial court in part, enjoined prospective disclosure of trade secrets relying however on a "substantial threat of disclosure" found in Wohlgemuth's statements indicating that he intended to use his secret knowledge to assist his new employer. Although Standard relies upon the decision, it should be noted that the court refused to enjoin Wohlgemuth from working for the new employer even on the project that involved space suit work and that it supported its issuance of an injunction by the ex-employee's statements indicating his intention to disclose trade secrets.

The second recent decision, also relied upon by Standard, is E. I. duPont de Nemours & Co. v. American Potash & Chemical Corp., 200 A.2d 428 (Del.Ch. 1964). An injunction was there sought to prevent a former employee, Hirsch, from disclosing trade secrets relative to manufacturing titanium dioxide pigments. The case was before the court on a motion for summary judgment. The Chancellor found that "[A]t least at this stage it is impossible to say that all of plaintiff's trade secrets in these areas are susceptible of consciously being so isolated by Hirsch," and that at the trial a "reasonable probability of disclosure" might be shown. The evidence might warrant "a possible finding after final hearing of a threat of unlawful disclosure sufficiently imminent to justify injunctive relief." The court therefore denied the motion for summary judgment. It did not determine the merits of the controversy nor indeed finally decide exactly what evidence would be required to support an injunction.[42]

These decisions do not therefore alter materially, if indeed they alter at all, the legal principles already stated. Absent imminence of disclosure, an injunction should not issue. Disclosure has not been shown to be either imminent or eventually inevitable.

If Zumpe is not fully aware of the areas in which confidential information and trade secrets exist, these reasons for judgment outline them fully to him. The evidence indicates that, should he violate his contract, Standard is likely to discover it soon. Enforcement measures can then be taken. While this may not be an absolute remedy, it is all that the principle of law regulating the use of the injunction affords.

With respect to the issuance of an injunction, there is one ultimate test. The suit for an injunction, in Loui-

---

40. Ibid. See also Ellis, Trade Secrets, § 353, page 451. "[T]he difficulty lies in the fact that an opportunity to disclose to others is not enough to support an action to enjoin disclosure."

41. Ellis, Trade Secrets § 253, page 341. See §§ 85 and 86, Ibid. See also H. B. Wiggins Sons' Co. v. Cott-A-Cap Co., 169 F. 150 (Conn.1909); S. S. White Dental Manufacturing Co. v. Mitchell, 188 F. 1017 (E.D.N.Y.1911); Dutch Cookie Machine Co. v. Mitchell, 289 Mich. 272, 286 N.W. 612 (1939); McCombs v. McClelland, 354 P.2d 311 (Or. 1960) and Ferranti Electric Inc. v. Harwood, 43 Misc. 2d 533, 251 N.Y.S.2d 612 (1964). See also Callman, Unfair Competition, 2d Ed. § 59.1, page 870.

42. With respect to the argument that disclosure of the trade secrets was inevitable, the Court observed:
"Plaintiff, as I understand its case, takes the basic position that proof of an inevitability of disclosure arising from Hirsch's employment by Potash, without more, will warrant the granting of the injunctive relief sought in this action, the threat of unlawful disclosure being implicit in the situation itself. The legal question involved in this proposition is, in my opinion, as complex as it is provocative, but it need not be resolved now."

siana, as at common law, seeks to invoke equitable relief.[43] Here as in other trade secrets cases, the court should seek to enforce "the difference between right and wrong, honesty and dishonesty."[44] The evidence does not persuade that Zumpe, either alone or in concert with Reily, has violated his contract or has threatened to do so or that a violation is either imminent or inevitable. There is no evidence of wrongdoing or dishonesty on his part. Absent disclosure or imminent threat of disclosure, injunctive relief should not be granted.

---

43. Louisiana Civil Code Art. 21 states, "In all civil matters, where there is no express law, the judge is bound to proceed and decide according to equity * * *" "Injunctive relief is an equitable proceeding * * *." Heard v. Seegers, La.App., 178 So.2d 789 (2d Cir.

1965). See also American Cyanamid Co. v. Roberts, La.App., 180 So.2d 810 (4th Cir. 1965).

44. Seismograph Service Corp. v. Offshore Raydist, 135 F.Supp. 342 (E.D.La.1955), affirmed 263 F.2d 5 (5th Cir. 1959).