### NCH CORPORATION

v.

### Lynn N. BROYLES, et al.

### Civ. A. No. 82–3728.

United States District Court,
E.D. Louisiana.

April 26, 1983.

---

Daniel Lund, New Orleans, La., Larry R. Margolies, Dallas, Tex., for plaintiff.

Charles F. Seabolt, New Orleans, La., John H. Schaller, Milwaukee, Wis., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

On March 7, 1983, this matter came on for trial, at the conclusion of which it was taken under consideration, both parties given until March 15, 1983 to complete the record with respect to the designation of various deposition testimony to be considered by the court, etc., etc.

1. Plaintiff NCH Corporation is a Delaware corporation whose principal place of business is in the state of Texas. Defendant Lynn N. Broyles is a citizen of the state of Louisiana. Plaintiff is successor by merger to all of the rights, contracts and causes of action of Mantek Corporation and Mantek Corporation of Texas, Inc. (Stipulation of Fact Nos. 1–3, Plaintiff's Exhibit No. 4.)

2. Jurisdiction is predicated on the existence of diversity of citizenship, 28 U.S.C. 1332(a)(1) and the requisite jurisdictional amount.

3. The Mantek Division of NCH Corporation is engaged in the manufacture, distribution, and sale of various chemical cleaning agents. It sells its products throughout the United States through commissioned sales representatives who the company seeks to motivate by various means, including a very conscientious maintenance of sales records, sales performances, etc., etc.

4. Defendant Broyles began working for Mantek as a sales representative in January of 1969. At that time, Mantek had no sales representatives (or customers) in the territory assigned to Broyles—it being their mutual intention to build up the sales area for their mutual gain.

5. At the time he was employed, Broyles executed a sales representative agreement with Mantek and, thereafter, in April of 1970, signed a district sales manager's agreement with Mantek. (Plaintiff's Exhibit No. 4.) These agreements contain various restrictive covenants, a non-competition clause, a non-solicitation clause, and a non-disclosure clause.

6. In paragraph three of both agreements, defendant expressly recognized and acknowledged that (1) by virtue of his employment he became familiar with and possessed of the manner, methods and confidential information pertaining to the company's business connections and customers, which are of great value to it; and (2) he acknowledged that plaintiff would suffer loss and damage by reason of his sales activities if he sold competitive products in the assigned territory. In this regard, I find that both acknowledged facts have, indeed, come to pass and that the loss and damage noted above was occasioned with malice aforethought on the part of the defendant.

7. Defendant further agreed that for a period of 18 months following the termination of his employment with the plaintiff, he would not sell competing products within the assigned territory, nor would he solicit, divert or attempt to take away any of plaintiff's customers located within said territory.

8. In the event of a breach of these covenants, defendant agreed that the 18 month period was to commence from the date of the breach, but that in no event was the period to exceed two years.

9. In paragraph 6 of the agreements, defendant also agreed not to divulge to others or use for his own benefit any confidential information obtained during the course of his employment by plaintiff relating to sales, formulae, processes, methods, machines, manufactures, compositions, ideas, improvements or inventions belonging to or relating to the affairs of the plaintiff.

10. Mantek compiles, maintains and updates, with great conscientiousness and considerable expense and effort, certain route books for the use of its sales representatives. These books consist of detailed customer information including the names and addresses of customers, the identity of persons to be contacted for orders, and a sales history of products purchased, quantities purchased, container sizes, prices paid and frequency of purchases. These route books are regarded as highly sensitive and valuable by plaintiff. Defendant acknowledged as much in the contracts he executed with plaintiff. These books constitute a very basic part of Mantek's marketing strategy.

11. In March of 1982, defendant requested and received an updated version of his route books. I find that this action was taken with malice aforethought as will be hereafter discussed.

12. Over the course of 1981, defendant became dissatisfied with his employer. This discontent became acute in the months of February through June of 1982, culminating with his resignation on July 15, 1982. On the same date, defendant executed a written contract of employment with Share Corporation to sell that company's products in a territory in Louisiana which includes the territory formerly assigned to him by Mantek. Share Corporation is a competitor of plaintiff.

13. Defendant also executed a letter agreement with Share representing an agreement between the parties concerning defendant's fears and concerns that plaintiff would take legal action against him if he went to work for Share. In that letter agreement, Share agreed to pay all costs of defending Broyles in any litigation brought by his former employer. Share also agreed to pay defendant his average net taxable earnings over the previous two years on a monthly basis for any period of time he might be restrained from working for Share as a result of litigation. Share also agreed to pay any judgment obtained by plaintiff against defendant.

14. On August 2, 1982, defendant began selling Share's products in the territory assigned to him by Share to various customers including but not necessarily limited to those he called upon (and sold to) while employed by Mantek.

15. In August of 1982, defendant returned the route books noted above to Mantek.

16. I find that defendant has relied on the confidential customer information contained in those books in working for his new employer, at least to the extent that he did not rely solely on his memory in soliciting his former Mantek customers on behalf of his new employer.

17. Following defendant's resignation, plaintiff sent Al Franks, one of its most successful salesmen who customarily works in Houston Texas, into defendant's former territory in order to ensure that the servicing of its customers continued undisrupted. Al Franks made two trips into the territory (late July and in August of 1982) relying on plaintiff's route books to call upon defendant's former customers. His first trip was moderately successful. On his second trip, however, he met with almost no success.

18. Dal Donner, a sales manager with Mantek for 14 years, made a decision to transfer a salesman into the territory on a permanent basis. On or about August 10, 1982, he contacted Scott Landry, a salesman who had worked for the company in another area for some six months and had demonstrated ability in this line of work. Beginning in September, 1982, Donner and

Landry traveled to Houma to survey defendant's former territory and to call on his former customers. Following this trip, Landry accepted the position, and, in October, moved to that area.

19. It was initially agreed that Landry was to be paid on the basis of a $400.00 weekly draw against commissions earned, consistent with plaintiff's usual practice. Because Landry's efforts to successfully sell in the area were handicapped by defendant's competing efforts, Landry was unable to immediately make significant sales and was unable to earn commissions sufficient to pay back his draws. His reimbursement was accordingly reduced in mid-November to a salary of 80% of whatever commissions he actually earned per week; the other 20% to go towards paying back his prior advances. Landry was unable to significantly raise his sales within the next month, and did not earn enough to make a living. He terminated the arrangement in December of 1982, and no longer works for plaintiff.

20. Al Franks returned to defendant's former territory in January and February of 1983. On these occasions, he found that defendant's former customers had placed orders for competitive products sold by defendant, and were not interested in purchasing Mantek's products. Franks' inability to make sales was due to defendant's competition in the area. He also acknowledged that business "was down" in the oil patch.

21. Nothing further was done to regain the marketing position Mantek formerly retained in the territory, plaintiff being of the view that any further effort in the area would be futile.

22. Plaintiff contends that it is entitled to relief under a variety of legal theories of the case. It claims that defendant has misappropriated confidential customer information and is liable to it under the Louisiana Trade Secrets Act, La.R.S. 51:1431 et seq. That statute authorizes a trial judge to award a wronged plaintiff actual losses, the unjust enrichment to the misappropriator and/or attorneys' fees. Plaintiff in this case argues that it is entitled to a monetary award consisting of all three.

23. Plaintiff also contends that it is entitled to relief pursuant to the Louisiana Unfair Trade Practices and Consumer Protection Act, which declares unlawful all unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce. Violations of this statute entitle a plaintiff to an award of actual damages. La.R.S. 51:1405–1409. Finally, plaintiff argues that defendant has breached the terms of his employment agreements, as well as his fiduciary duties to his former employer, and that it is entitled to damages pursuant to La.Civ.Code art. 1934.

24. Defendant's right to engage in the business in which he has been active for some 13 years and to call on customers who he has played a major role in developing cannot be lightly disregarded. Nor can the plaintiff's express expectations of confidentiality of sensitive business information be ignored. Each parties' duties and rights must be tempered with consideration of the other's, and with the additional consideration of the public's interest in competition which is both fair and unfettered. *See generally In re Uniservices, Inc.*, 517 F.2d 492 (7th Cir.1975).

25. This balancing process is made difficult by the peculiarities of the instant case. It is recognized in the law of unfair competition that the protection of customer information presents a complex of considerations. 1 Von Kalinowski, Antitrust Laws & Trade Regulation 1.03[3][d] (1979). This difficulty is to some extent compounded by Louisiana's strong public policy against "restrictions on the spirit of free labor." *Marine Forwarding & Shipping Co. v. Barone*, 154 So.2d 528 (La.App. 4th Cir.1963). I previously denied plaintiff's Motion for Preliminary Injunction as well as its Motion for Reconsideration of that ruling. *See* Findings of Fact and Conclusions of Law, November 30, 1982; Minute Entry, December 30, 1982. The basis of these rulings was the strong public policy embodied in La.R.S. 23:921 against restrictions on free labor. Although covenants not to disclose trade secrets are generally enforceable in Louisi-

ana, I believe that Louisiana courts are effectively precluded by La.R.S. 23:921 from enjoining a defendant from working for a competitor or soliciting former clients because the new job may entail use of such "trade secrets" as may be more particularly described as confidential customer lists, etc., especially when defendant himself has played a material, continuing part in the confection of such lists. *See e.g., Standard Brands, Inc., v. Zumpe,* 264 F.Supp. 254 (E.D.La.1967).

26. I adhere to my conclusions in this respect. Balancing the competing interests of plaintiff and defendant, together with the public's interest in fair and unfettered competition, I conclude that plaintiff is not entitled to injunctive relief; but that plaintiff nevertheless is entitled to monetary relief for what amounts to a deliberate and flagrant disregard by defendant of the trust reposed in him by plaintiff and acknowledged by defendant in the employment contracts he executed with plaintiff. In the circumstances of this case, I conclude that plaintiff is thus entitled to some relief, whether or not the customer information at issue is technically classified as a trade secret. *See generally Nucor Corp. v. Tennessee Forging Steel Service, Inc.,* 476 F.2d 386 (8th Cir.1973); *Standard Brands, Inc. v. Zumpe,* 264 F.Supp. 254 (E.D.La.1967).

27. Defendant contends that plaintiff has failed to mitigate its damages, and thus should be precluded an award of damages. Defendant also argues that an award of damages would be inconsistent with my ruling concerning injunctive relief.

28. An award of damages to plaintiff does not conflict with the rationale which forms the basis for declining to issue injunctive relief. As noted in paragraph 26 above, I believe that defendant's deliberate and calculated conduct warrants an award of monetary damages to plaintiff. Nevertheless, plaintiff has a general duty to mitigate its damages. *Todd Shipyards Corp. v. Turbine Service, Inc.,* 467 F.Supp. 1257 (E.D.La.1978), and plaintiff has been, I find, somewhat remiss in this regard. I find that Scott Landry may well have achieved greater success had his employers supplied him with greater financial support, such as a fixed salary, and kept him in the area a longer period of time.

29. Plaintiff has suffered a loss of profits as a direct result of the actions of defendant. The amount of losses of profit need not be proven with mathematical certainty, and a trial judge is afforded a "great deal of discretion" in making a determination of this element of damages. *Almerico v. Highlands Ins. Co.,* 388 So.2d 1176 (La.App. 4th Cir.1980); *Schwartz v. U.S. Fire Ins. Co.,* 375 So.2d 718 (La.App. 4th Cir.1979). I conclude that plaintiff is entitled to actual damages for the past profits it has been deprived of since August 1, 1982 from the 40 customers formerly sold by defendant on behalf of plaintiff; and for future profits it would have obtained, for a total of 24 months from August 1, 1982. For purposes of calculating this award, I accept plaintiff's calculations concerning defendant's average monthly sales to the accounts in question on behalf of Share. Defendant's average monthly sales while working for Share for a five month period commencing August 1, 1982 was $9,185.83. Based on that figure, defendant's average profitability to Share over a 24-month period may be calculated at $60,185.52. Plaintiff is entitled to be compensated in this amount. To the extent that figure is lower than defendant's profitability to Mantek actually was (Plaintiff's Exhibit No. 59), I construe that to be as a result of a general depression in the business of many of defendant's customers. Moreover, because of my conclusions in paragraph 28 regarding duty to mitigate damages, I decline to award further damages or attorneys' fees to plaintiff except as hereinafter set forth.

30. Plaintiff also argues that it is entitled to $13,241.12 representing unearned commission advances to defendant. Defendant argues that this sum constitutes salary, and is not therefore returnable. Defendant cites cases standing for the proposition that, in the absence of an agreement to the contrary, a drawing account is in the

nature of a guaranteed minimum compensation for the employee's services and not a loan against commissions or profits to be earned. *M. & D. Simon Co. v. Blanchard,* 389 So.2d 401 (La.App. 4th Cir.1980); *Landry v. Huber,* 138 So.2d 449 (La.App.3d Cir.1962). I conclude that in the instant case there was "an agreement to the contrary" and that the draw was to be a loan against commissions to be earned. Accordingly, plaintiff is entitled to the additional sum of $13,241.12.

Judgment should be rendered in favor of plaintiff and against defendant in the amount of $73,426.64, plus legal interest from date of judicial demand and taxable costs. Plaintiff is instructed to prepare and submit a judgment consistent with the foregoing.