**OCILLA INDUSTRIES, INC., Plaintiff,**

v.

**Howard R. KATZ, Joseph M. Esposito, Jr., William G. Gassman, E. James Van Buskirk, Lawrence S. Zimmerman, and Direct Action Marketing, Inc., Defendants.**

No. CV–87–2676.

United States District Court, E.D. New York.

Nov. 2, 1987.

Leland G. Cook, Smith, Gambrell & Russell, Atlanta, Ga., Steven M. Nachman, Webster & Sheffield, New York City, for plaintiff.

Vaughn C. Williams, Skadden, Arps, Slate, Meagher & Flom, New York City, for Howard R. Katz, Joseph Esposito, Jr., E. James Van Buskirk, Lawrence S. Zimmerman, and Direct Action Marketing, Inc.

David N. Brainin, Locker, Greenberg & Brainin, New York City, for William Gassman.

Robert A. Jaffee, Burnham, Connolly, Oesterle & Henry, Washington, D.C., Thomas R. Lynch, Lynch, Rowin, Burnbaum & Crystal, P.C., New York City for counterclaimant Elijah Waldron.

David Parker, Kraver & Parker, New York City, for Howard R. Katz.

James C. McMillin, Werbel, Grossman & McMillin, New York City, for defendant John Simon.

## MEMORANDUM AND ORDER

RAGGI, District Judge.

Plaintiff, Ocilla Industries, Inc. ("Ocilla"), a 40% shareholder in defendant Direct Action Marketing, Inc. ("Direct Action"), sues that company and the five members of its Board of Directors derivatively for corporate waste and breach of fiduciary duties to the company's shareholders. In pursuit of the action, Ocilla moves for a preliminary injunction that would bar certain of the individual defendants from exercising rights of remuneration under Direct Action employment agreements that arise if there is a change of control at the company and their employment terminates. Ocilla further asks the court to enjoin defendants from issuing any shares of stock that

would dilute the rights of present share-holders, from exercising any stock options granted under a 1986 employee incentive plan, from enforcing a recent by-law amendment requiring action by 75% of the shareholders—rather than the previous 51%—to call a special meeting, and from evading New York law requiring an annual meeting. The motion for injunctive relief is granted insofar as defendants are or-dered to hold a shareholders' meeting on January 27, 1988. In all other respects it is denied.

## Findings of Fact

The parties are involved in a heated fight for corporate control of Direct Action, a New York corporation with headquarters on Long Island. Its principal business is the sale of consumer products through mail offerings included with credit card state-ments. Unlike many such fights which eventually find their way into the federal courts, this dispute involves no "outsider." Instead the dispute is primarily between Ocilla, a 40% corporate shareholder of Di-rect Action, and two directors, Howard R. Katz and Joseph M. Esposito, Jr., whom Ocilla placed on the Direct Action Board in late 1985, but with whom it has since be-come disaffected. Ocilla claims that Katz and Esposito have engineered a number of changes at Direct Action aimed at prolong-ing their tenure at the company, insuring disproportionate remuneration if any at-tempt is made to remove them, and ham-pering the shareholders from overturning any of their actions.

### 1. Ocilla's Investment in Direct Action

Ocilla is a Delaware corporation that builds mobile homes. Its headquarters are in Ocilla, Georgia. On December 2, 1985, Ocilla purchased 640,000 shares of Direct Action stock at a cost of $4.4 million in a single transaction on the American Stock Exchange. This represented approximate-ly 40% of the company's outstanding shares. As a result, Ocilla was given the right to designate four of Direct Action's eight directors. The four "Ocilla mem-

bers" of Direct Action's Board were de-fendant Howard Katz, an officer, director and founder of Ocilla, who had played a significant role in Ocilla's decision to invest in Direct Action,[1] Elijah Waldron, Chief Executive Officer of Ocilla and a director of the company, Emory Walters, another Ocilla director, and defendant Joseph M. Esposito, Jr., a former officer of one of Ocilla's subsidiaries.

On January 31, 1986, pursuant to an agreement between Ocilla and Direct Ac-tion, one of the four original members of Direct Action's Board of Directors re-signed, leaving the four new Ocilla mem-bers as a majority. Moreover, defendant William G. Gassman, then Chief Executive Officer and Chairman of the Board of Di-rect Action, agreed to give up the right to terminate his employment contract if there was a change of control at Direct Action in return for a salary increase and certain incentive compensation.

At the time Ocilla purchased its 40% in-terest in Direct Action the company was operating at a profit. It was, however, about to lose the account of Gulf Oil, a factor which, along with others, contribut-ed to significant losses beginning in 1986. Direct Action's earnings per share have in fact decreased from $.80 per share for fis-cal year 1985 to -$.27 per share for fiscal year 1987. Net sales have dropped from $44.9 million for fiscal year 1985 to $34.9 million for fiscal year 1987.

### 2. Katz and Esposito Assume Control of Direct Action

On February 27, 1986, pursuant to an agreement reached at an Ocilla directors' meeting, the seven member Board of Di-rect Action unanimously elected Howard Katz its Chairman. At about the same time Katz became the company's Chief Ex-ecutive Officer, replacing Gassman who as-sumed the title Chief Operating Officer. Esposito became the company's Executive Vice President for Corporate Development, Chairman of the Executive Committee and

---

**1.** Katz's tenure with Ocilla dated from 1980. It was interrupted in 1983 because of unspecified disagreements with Ocilla's then-Chairman, Warren Haber. When Haber left Ocilla in June, 1984, Katz returned. Haber returned to Ocilla in approximately February, 1987.

Secretary. Despite their titles, neither Katz nor Esposito ever performed their Direct Action duties at the company's long-time offices at 3601 Hempstead Turnpike, Levittown, New York. Instead, they operated from a suite of offices at 3000 Marcus Avenue, Lake Success, New York, and communicated with Gassman approximately once a week.

Katz and Esposito credit themselves with initiatives to strengthen Direct Action's financial condition, specifically re-organization of the company's accounting system under a new chief financial officer, implementation of diversified acquisition and improved marketing systems, and more efficient cost controls. For purposes of this order, it is unnecessary for the court to consider the *bona fides*, much less the effectiveness, of these efforts. They will be fully explored and resolved at a trial on the merits.

### 3. The September 19, 1986 Shareholders' Meeting—Preferred Stock and Stock Option Plan Authorization

On July 25, 1986, the Direct Action Board passed a number of resolutions which were presented to and ratified by the company's shareholders, including Ocilla, at the annual meeting on September 19, 1986. As a result, the company's Certificate of Incorporation was amended to authorize the issuance of up to 1,000,000 shares of preferred stock on such terms and circumstances as subsequently determined by Direct Action's directors; a 1986 Stock Option Plan for company employees was approved; and Gassman, Esposito, Katz and E. James Van Buskirk were elected as directors.[2]

Van Buskirk, who had been a Group Vice President at Sun Chemical and Chief Executive and Chairman of MKP Holdings, Inc., had also been affiliated with Katz some years earlier when both were employees of C. Brewer & Co, Ltd. In May, 1986, Katz had retained Van Buskirk, then in semi-retirement, to serve as a consultant on possible acquisitions for Direct Action.

### 4. The By–Law Amendment Requiring 75% Shareholder Action to Call a Meeting

On October 8, 1987, the now four member Direct Action Board considered an amendment to the corporate by-laws requiring action by 75%, rather than the previous 51%, of the shareholders to call a special meeting. Katz recommended this action to the Board as useful in defending against a hostile merger or takeover and in preventing harrassment of the President by a minority shareholder. Apparently there was, at the time, some concern that Ocilla was looking to sell its Direct Action Stock. What no one seems to have considered is that the new by-law gave Ocilla, by virtue of its 40% interest, a veto over any attempt by all other shareholders of Direct Action to call a special meeting. Gassman voted against the change. Katz, Esposito and Van Buskirk voted in favor.

### 5. The Katz/Esposito Employment Agreements

At about this same time, relations between Katz and Ocilla were deteriorating. Katz documented criticisms he had of financial reporting practices at Ocilla. On October 28, 1986, Katz resigned as Executive Vice President of Ocilla and announced he would not seek reelection to its board.

In the Fall of 1986, Direct Action retained Skadden, Arps, Slate, Meagher & Flom as new corporate counsel. In November 1986, that counsel consulted with Katz and Esposito and thereafter drafted employment agreements for them. No one else from Direct Action had any role in negotiating or setting the terms of these agreements, although they were subsequently shown to Direct Action's in-house counsel.

Apparently, the agreements were first presented to the Direct Action Board on December 9, 1986. Of the four members of the Board, Katz and Esposito, who obviously had an interest in the agreements, had played an active role in their being drafted; Van Buskirk, whose membership

---

**2.** Waldron and Walters, two of the four original Ocilla nominees did not run for re-election to the Direct Action Board, and Ocilla did not endeavor to replace them.

on the Board totalled approximately ten weeks, had earlier seen drafts of the agreements and discussed them with Katz; Gassman, the former Chairman and Chief Executive Officer of Direct Action, had not known of the agreements or seen them before the meeting.

The agreements, which are in effect until December 31, 1991, provide, in pertinent part, that upon a "change of control" at Direct Action and "termination" of the executive's employment, (1) by the Company other than for cause, retirement or disability or (2) by the executive for good reason, the executive is entitled, among other things, to a lump sum severance payment equal to three times his annual base salary at the time of notice of termination, plus the amount paid to him pursuant to any bonus or incentive plan in the year preceding the date of termination, plus redemption of various stock options. The practical effect of this provision is to entitle Katz and Esposito to severance payments of at least $375,000 each if there is a change in control.[3]

Pursuant to the agreements, any of three circumstances qualify as a change in control. First, under paragraph 6(i)(A), there is a change in control if, after the dates of the agreements, any person becomes the beneficial owner, directly or indirectly, of securities representing 20% or more of the combined voting power of Direct Action's then-outstanding stock. The agreement expressly includes in the concept of "indirect" ownership a change in the ownership of Ocilla's voting shares. Second, under paragraph 6(i)(B), there is a change in control if, during any two year period after the date of the agreement there is a change in a majority of the directors on the Board at the beginning of the two year period. An exception exists for new directors whose election or nomination is approved by two-thirds of the directors then still in office or themselves so approved. Third, under paragraph 6(i)(C), there is a change in control if the shareholders approve a complete liquidation of the Company, a sale of substantially all its assets, or a merger or consolidation with another corporation effecting a change of greater than 20% in the representation of Direct Action's outstanding securities.

The December 9, 1986 board minutes demonstrate that Katz and Esposito dominated the Board's discussion of these contracts, urging adoption to motivate the two men to devote themselves fully to Direct Action. The minutes fail to reflect any discussion of the costs and benefits of the agreements by counsel or anyone else with an intimate—but disinterested—knowledge of their terms.

According to the minutes, after the Katz/Esposito presentation, Van Buskirk said he would vote for the agreements because he believed Direct Action needed men of Katz's and Esposito's caliber and could not easily replace them. The affidavit he filed in this proceeding, however, strongly suggests that he did not fully understand the agreements. Therein, he states that payments under the agreements could be triggered "only on the action of a third party first acquiring control of Direct Action," a conclusion at odds with paragraph 6(i)(B) of the agreements, discussed, *supra.*

Gassman voted against the agreements. Thus, with one affirmative and one negative vote, passage of the agreements on December 9, 1986 was effected only because Katz voted for adoption of Esposito's agreement, and Esposito voted for Katz's.

At that same meeting, Lawrence S. Zimmerman was elected as a fifth member of Direct Action's Board, on the recommendation of Katz.

The next Direct Action Board meeting was held on February 12, 1987. Once again, the Board voted on the Katz/Esposito employment agreements (1) because of a request for reconsideration by Ocilla, and (2) because Direct Action's counsel had questioned the validity of the December 9, 1986 vote.

---

**3.** If termination is effected next year, because of a raise in annual salary, the minimum severance pay would be $450,000 for each executive.

This meeting took place approximately one week after an Ocilla Board meeting at which a settlement was proposed with a dissident shareholder group whereby Warren Haber, Katz's nemesis, would resume his seat on the Ocilla Board. Katz vigorously but unsuccessfully objected to this settlement at the Ocilla meeting. The minutes of the February 12, 1987 Direct Action meeting indicate that Ocilla was, at the time, experiencing financial difficulties and had sought a $3 million loan from Direct Action. Moreover, it wished to sell its Direct Action stock. Evidence at the hearing demonstrated that a potential buyer was offering Ocilla $8.00 per share of Direct Action stock, with the intent of offering $6.00 per share to an 11% holder, and $5.04 per share to all other stockholders. At the time, the stock was publicly trading at approximately $4.00 per share.

In this context, Gassman voted against the employment agreements, Van Buskirk and Zimmerman voted in favor, with Katz again voting for Esposito's agreement, and Esposito voting for Katz's.

On March 20, 1987, Katz reported to the Ocilla board that Direct Action's directors had refused to rescind the employment agreements or the 75% by-law. Nevertheless, on April 22, 1987, Ocilla's Chief Executive Officer, Elijah Waldron, wrote Katz a conciliatory letter asking him to continue operating Direct Action.

### 6. Issuance of Letters of Credit to Fund the Employment Agreements

At a May 21, 1987 meeting of the Direct Action Board, the directors unanimously voted to establish irrevocable letters of credit in favor of Katz and Esposito pursuant to the paragraph 9 requirement of the employment agreements requiring such action when a potential change in control occurred. The potential change in control was purportedly reflected in documents provided to the Direct Action directors by Esposito concerning a possible proxy fight at Ocilla that could, if successful, lead to a change in control of its Board. At the hearing, Katz initially professed uncertainty as to whether a change in control at Ocilla triggered a change in control at Direct Action pursuant to paragraph 6 of the employment agreements, but finally admitted that the former action did not constitute a change of control at Direct Action. He nevertheless defended issuance of the letters of credit on the ground that, if there was a change of control at Ocilla, the new board might have "different priorities, different objectives" leading them to "force a change in control in Direct Action." On this basis then, close to $900,000 of Direct Action's cash reserves of slightly over $3 millon were used to fund the letters of credit.[4]

The letters of credit were applied for on August 1, 1987, the day after this action commenced. On August 10, 1987, this Court heard argument on plaintiff's application for a temporary restraining order. In lieu of a ruling from the court thereon, the parties entered into a stipulation that provided that the defendants would give Ocilla and the court two days notice before they took a variety of actions, including the exercise of any rights under the employment agreements.[5] Nevertheless, on August 27, 1987, Katz and Esposito each took possession of irrevocable letters of credit issued by the Bank of New York in the amounts of $412,500 and $475,000 respectively. The letters are payable upon appropriate certifications from Katz and Esposito, and require no action by any other officer or director of Direct Action.

### 7. Scheduling Next Annual Meeting and Attempt to Sell Company

On October 15, 1987, the Board of Directors of Direct Action set January 27, 1988 as the date for the "annual" shareholders' meeting.

---

**4.** Evidence was adduced that Direct Action relies on its cash reserves to fund its mailings, but the precise impact of freezing $900,000 was not presented, save for the company's acknowledgement, in its June, 1987 10–Q filing with the Securities and Exchange Commission, that the action would "directly and indirectly impact [sic] the Company's financial position, liquidity and capital resource availability."

**5.** The parties did not submit the stipulation to the court for it to "so order" the terms therein.

On October 30, 1987, the Board issued a press release announcing that it was seeking a buyer for the company's stock (1) because it thought the company was undervalued by the market, and (2) because it feared an Ocilla victory at the imminent shareholders' meeting was not in the best interest of all shareholders.

### Conclusions of Law

To obtain a preliminary injunction, Ocilla bears the "formidable" burden of showing "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Hanson Trust PLC v. ML SCM Acquisition, Inc.,* 781 F.2d 264, 272–73 (2d Cir.1986); *Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 260 (2d Cir. 1984).

The facts adduced in the various affidavits and exhibits submitted by the parties, as well as in the evidentiary hearing conducted in the case, may very well raise serious questions as to whether certain of the named defendants breached fiduciary duties to Direct Action shareholders. Specifically, the evidence casts doubt upon whether Katz and Esposito, whose places on the Board of Directors of Direct Action are attributable solely to their appointment by past management of Ocilla, have, as a result of a falling-out with Ocilla, taken steps at Direct Action aimed not so much at benefitting that company and its shareholders but at prolonging their own tenure at Direct Action and insuring substantial remuneration if they are removed.[6]

Despite these possible serious questions, however, the court cannot say that plaintiff presently risks "irreparable harm" unless the broad injunction sought is entered. *See Baker's Aid v. Hussmann Food Service Corp.,* 830 F.2d 13 (2d Cir.1987) (where court finds likelihood of success on the merits, denial of injunction nevertheless appropriate where record fails to support finding of irreparable harm). A limited injunction relating solely to the shareholders' meeting is the only relief appropriate at this time.

### 1. *Issuance of Preferred Stock*

Addressing each of the requests for equitable relief, the court first considers Ocilla's request that defendants be enjoined from issuing stock that might dilute shareholder interest in the company. Specifically, Ocilla is concerned about the possibility that defendants will issue preferred stock, a power expressly authorized by shareholder vote (including Ocilla's) at Direct Action's September 19, 1986 annual meeting.

Not every issuance of preferred stock poses a threat of irreparable harm to the shareholders of a company. Preferred stock can be issued to benefit a company and its shareholders, as for example, when such an issuance raises capital necessary for some legitimate business acquisition. *Cf. Asarco, Inc. v. Court,* 611 F.Supp. 468, 476 (D.N.J.1985) (directors' power to issue preferred stock justified to shareholders as facilitating corporate acquisitions where flexible financing necessary). Ocilla's argument that an issuance of preferred stock could have as its impermissible purpose the dilution of its 40% voice in company affairs is, at this point, simply speculation. The record in fact demonstrates no present intention by defendants to issue any preferred stock. Because it is impossible to apply the strict standards for injunctive relief without knowing the circumstances under which any preferred stock issuance would be made and the possible harm that could ensue therefrom, the request to enjoin any and all issuance of preferred stock is, at this time, premature. *See Continental Group Inc. v. Amoco Chem. Corp.,* 614

---

**6.** Although the steps complained of which are the subject of the prayer for injunctive relief, occurred at different times and as a result of various authorizations—*e.g.,* sometimes with shareholder approval and sometimes with authorization from the Board of Directors—plaintiff argues that they reflect a common scheme to entrench present management, particularly defendants Katz and Esposito. The court makes no express finding on this point in light of its holding, detailed *infra,* that the only imminent irreparable harm faced by plaintiff concerns the holding of a shareholders' meeting.

F.2d 351, 359 (3d Cir.1980) (preliminary injunction not to be issued simply to eliminate possible " 'remote future injury', " *citing Holiday Inns of America, Inc. v. B & B Corporation*, 409 F.2d 614, 618 (3rd Cir.1969)); *Jackson Dairy Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979).

Moreover, since the authority given defendants to issue preferred stock came directly from the shareholders, this court is particularly reluctant to intrude absent the clearest satisfaction of the legal standards for injunctive relief. *See Norlin Corp. v. Rooney, Pace, Inc.*, 744 F.2d at 258.

### 2. *Exercise of Stock Options*

■ Similarly, the record reflects no present intention by any of the named defendants to exercise stock options, a right also created by shareholder vote. The present difference between the option price ($3.975 per share) and market price ($2.25 per share)[7] for Direct Action stock so clearly favors purchase on the open market that it is unlikely any options will be exercised in the near future. *See Continental Group, Inc. v. Amoco Chem. Corp.*, 614 F.2d at 359 (injunctions are not issued to restrain a party from doing something it has not attempted nor does not intend to do, *citing Standard Brands, Inc. v. Zumpe*, 264 F.Supp. 254, 267–68 (E.D.La. 1967)); *Mazanec v. North Judson–San Pierre School Corp.*, 614 F.Supp. 1152, 1155 (N.D.Ind.1985) (injunction denied where defendant had no intention of engaging in complained of conduct).

### 3. *Employment Agreements*

The risk of harm from exercise of the employment agreements by Katz and Esposito is perhaps more real. These two directors and officers of Direct Action would be entitled to over $350,000 each pursuant to termination clauses in these agreements. Both men apparently consider termination sufficiently likely that, on August 27, 1987, they had Direct Action fund letters of credit having a total value of close to $900,000 to satisfy their rights of remuneration.

■ Serious questions are raised by the manner in which these employment agree-

ments were drafted. For example, the only two individuals to speak to the outside counsel who drafted the agreements were Katz and Esposito, the beneficiaries under the agreements. No officer or director whose sole interest was Direct Action played any role in setting the terms of these agreements. When the agreements were presented to the Board of Directors, Katz and Esposito did not leave the meeting while discussion ensued. To the contrary, the board minutes of December 9, 1986 and February 12, 1987 suggest that they dominated the discussion concerning the agreements.

Board member Gassman who had been President and Chairman of the Board of Direct Action before Ocilla's acquisition of its 40% interest, voted against the agreements. He testified that he had not had any opportunity to see them prior to the meeting at which they were discussed and then did not have adequate time to review them. Although defense counsel argues that Gassman's negative vote really reflected dissatisfaction that he did not have a comparable termination agreement, the court finds, based on its observation of Gassman, its consideration of his testimony, and its review of his own agreement, that the concerns he expressed for the general welfare of Direct Action are sincerely held.

The only two "disinterested" directors to vote for the Katz/Esposito agreement, Van Buskirk and Zimmerman, neither of whom testified at the hearing, were brought onto the Direct Action Board in September, 1986 and December, 1986, respectively, by Katz. While defendants make much of the "independence" of these directors, when one considers the past association of Van Buskirk with Katz, the role Katz played in bringing both men onto the Board, their necessarily limited knowledge of corporate affairs given their short time on the Board, and the general inclination such outside directors have to defer to insiders, it would be appropriate to examine their actions with some care. *See Dynamics Corp. of America v. CTS Corp.*, 794 F.2d 250, 256

---

**7.** Price as of close of business October 29, 1987.

(7th Cir.1986). This is particularly so where the defensive measures they took on behalf of Katz and Esposito were not against some corporate outsider, but rather against possible action by Ocilla, Direct Action's largest corporate shareholder, and against that shareholder's recent nominees to the Board. *Id.*, 794 F.2d at 258.

Further questions are raised by the fact that Van Buskirk, in the affidavit he submitted in this action, states that he voted for the employment agreements because he believed the benefits therein provided would be paid only "on the action of a third party first acquiring control of Direct Action and then diminishing Katz's and Esposito's role in the company." This conclusion is not supported by the very terms of the agreement. Paragraph 6(i)(B) deems as one way for a "change of control" to occur when:

"during any period of two consecutive years (not including any period prior to the execution of this agreement), individuals who at the beginning of such period constitute the Board and any new director ... whose election by the Board or nomination for election by the company's stockholders was approved by a vote of at least two-thirds (⅔) of the directors still in office who either were directors at the beginning of the period or whose nomination for election was so approved, cease for any reason to constitute a majority thereof."

In plain English, a "change of control" can result from a rejection of a majority of the present Board of Directors by the present shareholders of the company. It does not necessarily require, as Van Buskirk assumed, any "third party" action.

█ The totality of the circumstances concerning the employment agreements thus raises serious questions as to whether the two independent directors' review of the agreements was so "shallow", and their approval so *"pro forma"*, so lacking in even the " 'reasonable diligence' [owed] in gathering and considering material information" as to be an inadequate perform-

ance of their fiduciary duty to the shareholders, even if reviewed under the "business judgment" rule. *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d at 274–75.[8]

Despite these serious concerns, however, the court cannot conclude that the shareholders face imminent irreparable harm from the mere fact that these agreements exist. By the very terms of the agreements, Katz and Esposito are not entitled to any money unless and until two separate events occur: (1) there is a "change in control" at Direct Action, followed by (2) the "termination" of their employment as executives under certain specific conditions. Neither of these events has yet occurred. In essence, then, Ocilla is asking this court to enjoin the named defendants from receiving monies to which they have no present right. The request for injunctive relief is simply premature.

Even if Katz and Esposito—who do after all possess the letters of credit—were somehow to obtain monies without the two agreement requirements being met, the amount taken would be easily discernable, such that this court cannot say the shareholders of Direct Action could not adequately recover any loss in an action for damages. *See Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d at 72 ("where money damages is adequate compensation a preliminary injunction will not issue"). Admittedly, the amounts at stake represent close to a third of Direct Action's ready cash. But, plaintiff has failed to come forward with specific evidence that would support the conclusion that such a cash depletion would irreparably harm the company. *See Baker's Aid v. Hussman Food Service Corp., supra.* This failure to show irreparable harm, even assuming receipt by Katz and Esposito of monies in violation of the agreements, must defeat the request for injunctive relief.

As already noted, under paragraph 6(i)(B) of the agreements, a change in control at Direct Action could be effected if, at

---

**8.** The court finds Esposito's and Katz's votes approving each other's agreements self-interested and, thus, subject to an even stricter scrutiny, wherein they have the burden to demonstrate

that the transactions were fair and in the best interests of the company. *Norlin Corp. v. Rooney, Pace, Inc.*, 744 F.2d at 264.

the next shareholders' meeting, a majority of the present Direct Action Board of Directors is replaced, a not unlikely possibility given the voting block controlled by Ocilla and its hostility to the present Board. Ocilla argues that unless a preliminary injunction is granted promptly, shareholders might be reluctant to vote against the present Board, knowing that a possible change in control would be the first step in activating rights by Katz and Esposito to hundreds of thousands of company dollars. Significantly, Ocilla does not say its own vote will be chilled. To the contrary, it is plain that Ocilla will vote at the earliest opportunity to oust the present Board. Its unsupported conclusion that other shareholders will be so affected would require this court to engage in speculation, which is inappropriate to a determination for injunctive relief. *See, Baker's Aid v. Hussmann Food Service Corp., supra,* (conclusory statement as to opinion of plaintiff's customers insufficient to establish irreparable harm); *Holland America Ins. Co. v. Succession of Roy,* 777 F.2d 992, 997 (5th Cir.1985) ("Speculative injury" insufficient to establish irreparable harm necessary to warrant injunction); *Continental Group, Inc. v. Amoco Chem. Corp.,* 614 F.2d at 359 (" 'injunctions will not be issued merely to allay ... fears and apprehensions ...' ", *citing Standard Brands, Inc. v. Zumpe,* 264 F.Supp. at 267–68); *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d at 72 (injury must be " 'actual and imminent' ", not " 'remote and speculative' " to warrant entry of injunction, *citing New York v. Nuclear Regulatory Comm'n,* 550 F.2d 745, 755 (2d Cir.1977)).

Moreover, the court is not persuaded that the relief sought addresses Ocilla's concern with any precision. A preliminary, as opposed to permanent, injunction would not necessarily bar Katz and Esposito from ever recovering the monies specified in their employment agreements. It is not impossible that, when this case is tried, a factfinder may uphold the agreements. A shareholder that voted against the present Board, relying on a preliminary injunction as some sort of statement that Katz and Esposito are not entitled to money under the agreement, could discover, some

months from now, that Direct Action is indeed obligated to the defendants for substantial amounts. Thus, while it is far from certain that a preliminary injunction will in fact have the liberating effect argued by Ocilla, it is possible that it will have a misleading effect on some shareholders. Accordingly, the court denies injunctive relief as to the employment contracts at this time given that, until there has been a change of control at Direct Action, the risk of harm to the shareholders is not sufficiently imminent.

### 4. Shareholders Meeting

Ocilla seeks an injunction barring defendants from enforcing a by-law passed by the Board of Directors on October 8, 1986 that requires 75% shareholder approval for a special meeting of shareholders to be called. It further asks that defendants be enjoined from violating those provisions of the New York Business Corporation Law that require an annual meeting of shareholders. N.Y.Bus.Corp.Law. Sections 602 and 603.

From the inception of this litigation, the court has expressed its concern over the calling of an annual meeting of Direct Action shareholders, the last such meeting having occurred on September 19, 1986. Where parties so radically disagree about the future direction of a company, as in this lawsuit, it is appropriate to insure that the issues be resolved by the company's shareholders. *Norlin Corp. v. Rooney Pace Inc.,* 744 F.2d at 258.

Although Direct Action's by-laws do provide for an annual meeting, no express date for the meeting is set therein. Instead, it is left to the directors to set the annual date. When the court, on almost every occasion when the parties have been before it, has asked if a date has been set, defense counsel has relied on Section 603 of the New York Business Corporation Law as providing the statutory limits for the calling of an annual meeting. Finally, on October 20, 1987, counsel for defendants advised the court that defendants expected to hold an annual meeting on January 27, 1988.

Section 603 of the Business Corporation Law does not, strictly speaking, set limits for the calling of "annual" meetings. Rather, it provides for the calling of a "special" shareholders' meeting by the Board of Directors if an annual meeting has not been called by the date fixed in the by-laws or if, as in this case, "no date has been so fixed, for a period of thirteen months after . . . the last annual meeting." Presumably, then, under New York law, annual meetings are contemplated to occur no later than thirteen months after the last such meeting, which in this case would have required the annual meeting to be held by October 19, 1987. *See, In re Unexcelled, Inc.* 28 A.D.2d 44, 281 N.Y.S.2d 173 (1st Dep't 1967)[9] This was plainly not done.

Where an annual meeting is not held for a period of thirteen months after the last annual meeting, Section 603 gives the directors two weeks after the expiration of the thirteen month period to call a "special" meeting. Otherwise, a special meeting may be called by as few as 10% of the shareholders.

The defendants are within the thirteen month, two week period to call a special meeting. Section 603, however, also empowers 10% of the shareholders to call a special meeting if there has been "a failure to elect" new directors two months after expiration of the thirteen month period. In short, Section 603 contemplates that a special meeting will be called by the directors no later than fifteen months after the last annual meeting, or in this case, by no later than December 19, 1987, over five weeks before the January 27, 1988 date.

Defendants argue that they cannot adequately prepare for the impending proxy fight or present their views of what is best for the company by December 19, 1987. Such a motive is not sufficient to justify delaying the shareholders' right to determine the corporation's future. *See Silver v. Farrell,* 113 Misc.2d 443, 450 N.Y.S.2d 938, 942 (Sup.Ct. Monroe County 1982); *see also Norlin Corp. v. Rooney Pace Inc.,* 744 F.2d at 258.

The court finds that the January 27, 1988 date set for the shareholders' meeting goes beyond the period contemplated by the Direct Action corporate by-laws and the applicable laws of the State of New York. The disenfranchisement of shareholders poses a serious risk of irreparable harm that cannot be measured in money damages. Although Section 603 provides a remedy for shareholders when directors fail to call annual or special meetings within the contemplated time, this is not exclusive, particularly since, in practice, it would mean the 10% shareholders could not obtain a meeting until February 20, 1988, at the earliest.[10] *Silver v. Farrell,* 450 N.Y.S.2d at 941. (Section 603 provision for 10% of shareholders to call special meeting is not exclusive remedy where directors fail to call annual meeting required by by-laws). Defendants would limit application of *Silver v. Farrell* to cases where corporate by-laws provide a specific date for an annual meeting. Neither the plain language of Section 603 nor the logic of *Silver v. Farrell* warrants such a limited view. *See In re Unexcelled, Inc.* 281 N.Y.S.2d at 176.

At this point in the proceedings it is important that "all concerned can be confident that . . . [a] shareholders' meeting will indeed take place . . ." *Silver v. Farrell,* 450 N.Y.S.2d at 942. Accordingly, the court grants such part of plaintiffs' motion for a preliminary injunction as pertains to

---

**9.** In this case, the New York court held that no law required directors to wait a full year to hold an "annual" meeting. But in reaching this decision it noted:

"Where the legislature has wanted to protect the shareholders and corporation from an undue extension by the directors of their terms of office a specific statutory provision has been made. Thus in Section 603 of the Business Corporation Law it is provided that a special meeting of shareholders may be called for the election of directors if a regular meeting for such purpose has not been called within thirty days after the date fixed in the by-laws for the annual meeting or since the last annual meeting."
*Id.* 281 N.Y.S.2d at 176.

**10.** Under Section 603, when 10% of the shareholders make written demand upon the directors for a meeting—which in this case they could do anytime after December 19, 1987,—such meeting is to take place not "less than sixty nor more than ninety days from the date of such written demand."

the holding of a shareholders' meeting. Defendants will be required to hold a meeting of Direct Action shareholders on January 27, 1988. This is the date finally indicated by defendants when they would hold a meeting. Thus, compliance with the order should work no hardship on them. A court order, it is expected, will add "certainty to the situation" and assure no further postponements. *Id.*

Although plaintiff claims that a delay until January, 1988 will result in irreparable corporate harm because of defendants' poor management of corporate affairs, the court finds the present record insufficiently specific to support such a conclusion or to warrant the confusion that could ensue if another date were arbitrarily selected by the court without a full appreciation of the many steps that must be taken by both sides to present their respective views of the future best interests of the company to the shareholders, consistent with government regulations.

The fact that the ouster of Katz and Esposito from their management positions at Direct Action, if it occurs after January 1, 1988 rather than before, would, under the employment agreements cost the company an extra $300,000 in severance pay, is an injury for which, if plaintiff succeeds on the merits, it can be adequately compensated at trial.

Similarly, although the recent Direct Action Board decision to seek a buyer for the company could, if successful, satisfy the first trigger of the employment agreements, because all parties concede that such a sale could not be consummated without shareholder approval, there is no imminent irreparable harm to the shareholders from the mere fact that such a buyer is being sought before the January 27, 1988 meeting.[11]

## CONCLUSION

The request for a preliminary injunction is granted insofar as defendants are hereby directed to hold a meeting of Direct Action shareholders on January 27, 1988 and to

give due and proper notice of such meeting with the required information to the shareholders as provided by law and the by-laws of the corporation. In all other respects the motion for an injunction is denied.

for a special meeting. The competing claims as to this by-law can be resolved at the trial on the merits.

---

11. Because the court is ordering a shareholders meeting on January 27, 1988, there is no need preliminarily to enjoin enforcement of the by-law provision requiring 75% shareholder action