RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0035P (6th Cir.)
File Name: 01a0035p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

J. DOUGLAS CAMPBELL,
(99-5074), PETER H. KESSER
(99-5077), and ALFRED L.
WILLIAMS, JR. (99-5079),
  *Plaintiffs-Appellees,*

  *v.*

POTASH CORPORATION OF
SASKATCHEWAN, INC., a
Saskatchewan Corporation,
  *Defendant-Appellant.*

Nos. 99-5074/
5077/5079

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
Nos. 97-02425; 97-02426; 97-02428—Jon Phipps
McCalla, District Judge.

Argued: March 9, 2000

Decided and Filed: February 2, 2001

Before: NELSON, BOGGS, and NORRIS, Circuit Judges.

1

_____

**COUNSEL**

**ARGUED:** Robert H. Klonoff, JONES, DAY, REAVIS & POGUE, Washington, D.C., for Appellant.  Richard L. Fenton, SONNENSCHEIN NATH & ROSENTHAL, Chicago, Illinois, for Appellees.  **ON BRIEF:** Robert H. Klonoff, Daniel H. Bromberg, JONES, DAY, REAVIS & POGUE, Washington, D.C., Bruce S. Kramer, Jeff Smith, BOROD & KRAMER, Memphis, Tennessee, for Appellant. Richard L. Fenton, Lori Anne Ward, SONNENSCHEIN, NATH & ROSENTHAL, Chicago, Illinois, for Appellees.

_____

**OPINION**

_____

   BOGGS, Circuit Judge.   The Potash Corporation of Saskatchewan, Inc. ("PCS") appeals from the district court's partial grant of summary judgment and its judgment after trial in favor of plaintiffs-appellees J. D. Campbell, Peter Kesser, and Alfred Williams, Jr., all former executives of the Arcadian Corporation.  Campbell (the former President and CEO), Kesser (the former Vice-President and General Counsel), and Williams (the former Vice-President and CFO) sued PCS for breach of contract approximately two months after its successful March 6, 1997 merger with Arcadian, because PCS refused to make severance payments to the executives triggered under those executives' employment agreements[1] by the change in corporate control of Arcadian and additional "good cause."

_____

   [1]This opinion will follow the district court in using the terms "employment agreements" and "severance agreements" interchangeably to refer to the executives' agreement with Arcadian.

restricted stock rights that PCS argues did not vest until 1997 could and should still be included in the severance package calculations.

   Other than these few corrections, we agree with the calculations as found by the district court.

**VI**

   PCS has already received the benefit of the bargain it struck concerning golden parachutes (in having an orderly change in corporate control and in insuring Arcadian's health in the event of a failed effort to merge), and it cannot now refuse payment in return.   There was consideration for the assumption agreement insofar as it was bound up in the merger obligations. Golden parachutes are not void as against public policy, nor did the Arcadian board exhibit gross negligence in approving the golden parachutes at issue in this case. Finally, although the district court correctly interpreted the multiplier clause's language based on extrinsic evidence gathered at trial, it committed clear error in counting certain incentive payments that were made in respect of more than two years.  For these reasons, the judgment of the district court on partial summary judgment and after trial is AFFIRMED in part, REVERSED in part, and REMANDED back to the district court for further proceedings consistent with this opinion.

testimony. But counting the incentives according to when they vested does not justify the double counting of benefits of which PCS complains. The severance agreement only calls for looking at the average of the previous two years' "bonus, profit sharing, and other incentive payments," so only two years of vesting should be looked at, regardless of what the vesting schedule may artificially include or exclude from that time frame.

Hence, in reconciling benefits that vest all at once with those that vest ratably over time, we hold that the multiplier clause permits, for instance, the counting of 1994 benefits that vested in 1996 *on top of* 1995 benefits that vested in 1996. To the extent that PCS objects to that as "double counting," we disagree. The executive had to remain for another calendar year in order for the benefits from two prior years to vest, so those benefits are reasonably construed as payments made in respect of the calendar year when they vested. However, we further hold that the multiplier clause does not permit counting any benefits that vested in 1997 as being "in respect of" an earlier year. PCS makes this argument using the "double counting" label too, but the objection is better styled as impermissibly counting incentive payments made in respect of more than two calendar years.

We perceive one possible wrinkle in the counting rule just laid down. PCS objects to the inclusion of restricted stock from 1996 in the multiplier, because the company claims that those stock rights vested in 1997. The district court did not treat this problem in detail, but it appears that the vesting rule for the restricted stock may have been different than the vesting rule for the SARs and CESARs. Whereas the latter benefits vested on January 1 in the year following that in which they were granted, the restricted stock benefits appear to have vested as soon as the firm hit its performance target in the relevant year. Thus 1996 rights may have vested in 1996, even though the company could not confirm that it hit the performance targets until sometime in 1997. If the district court on remand agrees with this analysis, then the 1996

PCS moved to dismiss plaintiffs' charges for failure to join PCS Nitrogen (the merger subsidiary wholly owned by PCS into which Arcadian was absorbed) as an indispensable party. The district court denied that motion on September 16, 1997. PCS and PCS Nitrogen filed suit in Tennessee state court against plaintiffs at about that time, claiming breach of fiduciary duties by the executives, and seeking a declaration that the employment agreements were unenforceable. Plaintiffs removed that case to federal court claiming ERISA pre-emption, but it was remanded back on July 21, 1998.

Having received cross-motions for summary judgment, the district court granted partial summary judgment to plaintiffs on August 13, 1998, rejecting PCS's arguments that the severance agreements were void for lacking consideration and for contravening public policy, and holding that the contracts were enforceable against PCS. At the bench trial that began August 17, the court heard testimony regarding the proper construction of the multiplier clause in the severance agreements. The court then rendered a November 18 judgment that accepted the plaintiffs' interpretation of most aspects of the multiplier clause, and it ordered PCS to pay plaintiffs' attorney's fees and tax penalties. On December 1, after having received revised calculations from the parties in accord with its earlier decision, the court issued a revised opinion awarding precise damages. We agree with the district court's judgment concerning the contract consideration and public policy issues; however, we disagree slightly with its damage calculation. Therefore, we will affirm the district court in part, reverse it in part, and remand the case for revisions in the calculation of damages.

## I

PCS, a Saskatchewan fertilizer corporation, approached Arcadian, a Tennessee fertilizer corporation, about a possible merger in August 1996. The Arcadian board decided to pursue the overture on August 27, and heard a presentation on proposed severance plans at that time. Over Labor Day

weekend, Arcadian and PCS negotiated the terms of the merger and the severance agreements. PCS's Executive Committee and the Arcadian board approved and executed the merger agreement at respective board meetings on September 2. After approving the agreement, the Arcadian board approved employment agreements for nine senior executives that included so-called golden parachutes. *See Brown v. Ferro Corp.*, 763 F.2d 798 (6th Cir. 1985) (discussing the operation of golden parachute severance agreements). Campbell, Kesser, and Williams signed employment agreements containing these parachutes three days later. The "golden parachute" portion of the severance package provided a formula to compensate senior executives in case of a change in corporate control accompanied by a material change in the executive's position at the new company. In such a circumstance, the executive could leave the company and receive an aggregate payment in one lump sum within 30 days of termination, totaling:

> an amount equal to the sum of (A) three (3) times Executive's Base Salary in effect at the time of [the Executive's] termination . . . , (B) three (3) times the average of all bonus, profit sharing and other incentive payments made by the Company to Executive in respect of the two (2) calendar years immediately preceding such termination, and (C) the pro-rata share of Executive's target bonus, profit sharing and other incentive payments for the calendar year in which such termination occurred
> . . . .

¶4.3(c)(1)(ii) of the Employment Agreement.

Arcadian's compensation system historically emphasized incentives, enhancing an industry median base salary with supplemental incentive payments for meeting performance targets as well as profit-sharing payments and additional bonuses. Under the 1994 profit-sharing plan (only), appellees were also eligible for performance-based SARs (stock appreciation rights) and CESARs (cash equivalent SARs),

At the bench trial concerning the interpretation of the multiplier clause, plaintiffs presented the testimony of three members of the Arcadian board who said they understood the multiplier to include all incentives, including long-term ones, ESOPs and SERPs. Kesser likewise testified that long-term incentives, including ESOPs and SERPs, were included. Plaintiffs also showed that Arcadian had provided PCS with drafts during the Labor Day weekend negotiations and a mid-September spreadsheet to PCS's outside benefits consultant that included such long-term incentives. Aside from the language of the multiplier and the drafting history, PCS built its case below on expert testimony that long-term incentives are rarely included in multiplier clauses and that when they are included, the clauses are very specific. The district court agreed with PCS that the ESOPs and SERPs were retirement benefits, not incentive payments to be included in the multiplier. However, it found that the SARs, CESARs, and stock options were incentive payments that Kesser intended to include, the Arcadian board thought were included, and the spreadsheet to PCS listed as included. Hence, it deemed them properly included in the multiplier, even though other evidence suggested that long-term incentives are rarely included in a severance multiplier. Given the evidence presented at trial, we hold that the district court's decision to include the SARs and CESARs while excluding the ESOPs or SERPs in the "other incentive payments" is not clearly erroneous.

We further hold that the district court did not err in deciding that "in respect of" a given year means that SARs (including individual SARs) and CESARs should count as of the year they vest. These benefits are not payments when they are distributed, but only once they vest. Though they are not cash compensation, plaintiffs argue they must be treated for tax purposes as income in the year when they become redeemable for cash. *See* Plaintiffs-Appellees' Brief, at 57, *citing* Proposed Treas. Reg., § 1.280G-1, A-12. Arcadian treated them as such before contemplating the merger, and such treatment of these benefits is standard, according to trial

district court held that the clause is unambiguous as a matter of law, but it also held that extrinsic evidence supported most aspects of the plaintiffs' interpretation of the clause. Thus, to secure a reversal of the trial court's factual findings based on extrinsic evidence, PCS must show that the multiplier clause in the Employment Agreements plainly excludes long-term incentives when it refers to "all bonus, profit sharing and other incentive payments," and that the district court therefore committed clear error.

PCS first argues for application of the *ejusdem generis* rule of construction so that "other incentive payments" would mean payments that are like bonuses and profit sharing in being short-term incentives. Moreover, PCS adds, there would be no reason to mention bonuses and profit sharing if *all* incentives were encompassed by the word all, because bonuses and profit sharing payments would be included already. PCS also notes that the multiplier provides for payment of the "pro-rata share of Executive's target bonus, profit sharing and *other incentive payments for the calendar year* in which such termination occurred" (emphasis added). Coming so soon after the other reference, PCS reasons that the earlier reference must also refer to calendar-year (i.e., short-term) incentives. Further, because the employment agreement elsewhere refers to SARs, CESARs and stock options as "Stock Incentive Rights," PCS reasons that those items cannot be subsumed by the phrase "other incentive payments." Although these arguments are somewhat plausible, we cannot say that the multiplier formula's language plainly excludes long-term incentives.

PCS also argues that the terms of the employment agreement should be construed against Kesser as one of the document's drafters, and that it should be construed narrowly due to offending public policy. But PCS took part in the drafting too and the parachutes do not violate public policy, so these arguments are unavailing.

which vested ratably over three years after they were granted. In addition to the formal plan, Arcadian distributed other stock options without regard to company performance. It also contributed 4% of each employee's annual compensation into an Employee Stock Ownership Plan (ESOP) and into a Supplemental Executive Retirement Plan (SERP) for certain higher-salaried employees whose income level precluded their full participation in an ESOP.

At PCS's insistence during the Labor Day weekend discussions, Arcadian reduced the number of secondary events that could trigger the golden parachutes following a change in corporate control, and devised a formula based on actual compensation for the two calendar years preceding termination rather than on expected compensation for the two years following termination. Ironically, the look-back formula was adopted in part because PCS felt a retrospective formula would be less contestable than a prospective one. PCS also requested that the multiplier be limited to salary and bonuses, but Arcadian indicated that its pay structure was too incentive-laden for that to be feasible. Bruce Jocz of Bracewell & Patterson, Kesser's former law firm, drafted the clause under Kesser's direction.[2] In Jocz's brief presentation to the board following approval of the merger, no mention was made of whether the "other incentive payments" in the multiplier formula included long-term incentives. Rather, Jocz's summary described the formula as 3 times base salary, plus 3 times prior years' average profit-sharing and bonus, plus a pro-rata share of current year's profit-sharing or bonus. Arcadian Executive Charles Lance presented slides suggesting that the multiplier totaled 36 months of salary and

---

[2] Jocz modeled the first iteration of the employment agreements after golden parachutes that had been devised for another client to ward off a hostile takeover. As such, the original draft proposal included more generous parachutes that could be triggered simply by a change in control. PCS rejected that draft and suggested using the golden parachute agreements it had with its own executives as an alternative model. Jocz then adapted PCS's model to Arcadian's needs.

bonus. However, in a mid-September spreadsheet prepared for PCS and its outside benefits consultant (Richard Davenport of Deloitte & Touche) calculating the golden parachutes, Lance did include stock rights, stock options, and performance-based SARs and CESARs from the 1994 profit sharing plan in the multiplier formula (but, perhaps inadvertently, left other individual SARs out of it).[3] Lance sent PCS copies of all Arcadian benefit plans for due diligence purposes.

Several weeks later, Lance added the individual SARs, CESARs, ESOPs and SERPs to the spreadsheet, and Davenport added some other accidentally omitted long-term incentives to correct the spreadsheet. Lance drafted administrative guidelines interpreting the variable components of the multiplier clause. Arcadian's accounting department calculated potential severance payments based on a 1996 and a 1997 merger closing, which Arcadian's outside auditors Peat Marwick then reviewed. The compensation committee reviewed and approved the administrative guidelines on October 21 and reported its action to the full board the following day. In early November, Lance contacted his counterpart at PCS to call attention to the much higher severance benefit costs that would be entailed by a 1997 closing. Shortly thereafter, PCS told Lance it thought the severance packages should be limited to three times cash compensation, but Lance said that was inconsistent with both his understanding of the terms reached and the language of the employment agreements.

The agreements also contained a provision requiring Arcadian to obtain an assumption agreement from any "direct or indirect" successor agreeing "to expressly assume and agree to perform, by a written agreement in form and substance satisfactory to Executive, all of the obligations of

---

[3]Arcadian occasionally granted non-performance-based SARs to employees as compensation. Campbell, for instance, apparently received some SARs as a kind of signing bonus when he came to Arcadian.

member Chester Vanatta, relied on by the district court, the board understood the nature of the benefits, knew that PCS had approved the severance packages, had a rough idea of the cost and knew what was included, wanted to retain the personnel in case the merger failed to go through, and vetted the severance packages through its compensation committee. Finally, PCS also suggests a measure of self-dealing in the approval of these severance packages, but Mr. Campbell is the only plaintiff who was on the board, and he acknowledged his conflict and abstained from the vote.

The Arcadian board therefore exhibited nothing like the lack of knowledge and the swiftness of deliberation condemned in the *Van Gorkom* or *Hanson* cases. *See Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985); *Hanson Trust PLC v. ML SCM Acquisition, Inc*., 781 F.2d 264 (2d Cir. 1986). Nor does this case feature the kind of insider-dealing on a stacked board decried in *Ocilla Indus., Inc v. Katz,* 677 F. Supp. 1291, 1299 (E.D.N.Y. 1987). Nor do the severance agreements at issue here approach the possibly wasteful use of corporate assets entailed in the Walt Disney Company's non-fault termination of Michael Ovitz recently adjudicated by the Delaware Supreme Court. *See Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000) (dismissing the action without prejudice on procedural grounds, but observing that "the sheer size of the payout to Ovitz [$140 million for less than 15 months of work] . . . pushes the envelope of judicial respect for the business judgment of directors in making compensation decisions"). If the Ovitz severance payment, which included $39 million in cash, only pushes the envelope under Delaware law, then the smaller sum here spread across three executives with longer tenure at their company is well within the confines respected by the business judgment rule.

## V

Having upheld the district court's partial summary judgment on the consideration and public policy issues, we turn finally to its interpretation of the multiplier clause. The

Even if we ourselves did not perceive a good rationale for these parachutes, courts should be loath to condemn a business practice simply because they do not perceive a good rationale for a given practice. Condemning poorly understood practices simply for lack of a clear rationale would substitute the court's business judgment for the corporation's. "If what management did was illegal, . . . it should be enjoined. If it wasn't illegal, it should be allowed even if philosophically unpalatable and, if a court cannot tell, it seems . . . that this is what the business judgment rule is all about and the nod should be given to those who are vested with the business decision making responsibility." *Edelman v. Fruehauf Corp.*, 798 F.2d 882, 889 (6th Cir. 1986) (Guy, J., dissenting). In short, evaluating the costs and benefits of golden parachutes is quintessentially a job for corporate boards, and not for federal courts.

In Delaware, whose law the parties agreed would govern disputes under this contract, a plaintiff must show that the majority of the board acted in a manner that "rise[s] to the level of gross negligence" before a court may second guess its business judgment. *Mount Moriah Cemetery ex rel. Dun & Bradstreet Corp. v. Moritz*, Civ. A. No. 11431, 1991 WL 50149, at *4 (Del. Ch. April 4, 1991), *aff'd*, 599 A.2d 413 (Del. 1991). PCS argues that the Arcadian board was misled by incomplete slides and presentations made to it about the golden parachutes, and states that the board did not know the total possible cost of the golden parachutes at the time it approved them. As evidence of neglect of the board's duty of care, PCS points to the statements by Arcadian's chairman about the parachutes that "whatever they cost, they cost," and that it would be PCS's responsibility to pay the severance packages anyway. But even if deemed incriminating, these remarks do not show gross negligence by a majority of the board. Board members had a reasonable amount of accurate information about the severance packages before them when they acted. The lack of a completely accurate total outlay estimate before approval does not rise to the level of gross negligence. According to the deposition of independent board

the Company [Arcadian] under this Agreement." Failure by Arcadian to obtain such an agreement from a successor automatically triggered the golden parachutes upon a change in control. PCS and Arcadian filed a Joint Proxy Statement with the SEC on January 28, 1997, laying out the severance formula, including incentive payments, lump-sum pension benefits, and the tax gross-up feature whereby the company increased the golden parachutes to cover related taxes.

PCS continued to resist Arcadian's inclusion of long-term incentives in the formula. Plaintiffs' counsel thus recommended that plaintiffs engage Arthur Anderson to produce a report justifying plaintiffs' interpretation of the golden parachutes, to defend against a possible challenge by PCS. The audit confirmed that the employment agreements were "well within competitive practice." The compensation committee heard the report on February 24, but took no action. Then Arcadian's chairman refused to hear a report to the full board, stating that it was part of PCS's due diligence and "whatever it costs, it costs."

Two days before the March 6, 1997 closing, Kesser demanded that PCS and PCS Nitrogen expressly assume the golden parachute severance agreements signed by plaintiffs. PCS Senior Vice-President and General Counsel John Hampton refused, saying PCS was not the successor to Arcadian's business or assets. Kesser threatened to delay closing on March 6, causing Hampton to have Barry Humphreys, PCS's Senior Vice-President for Finance, sign the assumption agreement on behalf of PCS to avoid delaying closing and incurring difficulties with merger financing. Hampton himself signed on behalf of PCS Nitrogen as its Secretary.

Prior to closing, Campbell and Williams were offered jobs at PCS Nitrogen materially different from their previous ones with Arcadian, so both terminated at closing for good cause. Hampton released Kesser from the new company's employ at the closing. Though PCS acknowledged that it owed some

amounts to Campbell, Kesser and Williams, it refused to pay even the undisputed portions of their severance packages within the allotted thirty days, thereby precipitating this suit.

## II

This court reviews a district court's grant of partial summary judgment under a *de novo* standard. *See Wathen v. General Elec. Co.*, 115 F.3d 400, 403 (6th Cir. 1997). Review for existence of a genuine issue of material fact is limited to the evidence before the district court when it ruled. *See Dickerson v. McClellan*, 101 F.3d 1151, 1164-65 (6th Cir. 1996). This court reviews the trial court's factual findings only for clear error. *See Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1165 (6th Cir. 1996). Contract interpretation questions, however, are "generally considered questions of law subject to *de novo* review." *Golden v. Kelsey-Hayes, Co.*, 73 F.3d 648, 653 (6th Cir. 1996). The existence of ambiguity is a *de novo* question for this court, but a trial court's resolution of ambiguity based on extrinsic evidence may not be overturned unless clearly erroneous. *See John Morrell & Co. v. Local Union 340A of the United Food and Commercial Workers*, 913 F.2d 544, 550 (8th Cir. 1990); *United States v. Plummer*, 941 F.2d 799, 803 (9th Cir. 1991).

## III

The first question we must address is whether the assumption agreement is an invalid contract on the grounds that it is a classic hold-up agreement. PCS claims that it was forced to sign under duress due to the time-sensitive financing it had arranged for the pending merger. Plaintiffs respond that the drop-dead date for the merger had been extended until April 30, so that missing the March 6 deadline would not have been as fatal for PCS as it pretends. Whichever is true, PCS certainly knew that the parties had an ongoing disagreement over the severance packages, so it can hardly pretend that Arcadian's insistence upon resolving the dispute with an assumption agreement came at the last minute. That

company for a time after the merger. Four did not, including the three plaintiffs in this case. At least one court has embraced a similar rationale for golden parachutes in the past. *See Koenings v. Joseph Schlitz Brewing Co.*, 377 N.W.2d 593, 603-04 (Wisc. 1985).[6]

Mixed with its argument about public policy, PCS argues against application of the business judgment rule to this case. *See Brown*, 763 F.2d at 800 n.2 (discussing the business judgment rule). Not only did the manner of the golden parachutes' adoption violate public policy, according to PCS, it also violated a duty of care prerequisite to applying the business judgment rule. PCS repeatedly refers to the *Gaillard* case as similar, but a California appeals court case applying California law is not binding precedent for this circuit's application of Delaware law. *See Gaillard v. Natomas Co.*, 256 Cal. Rptr. 702 (Cal. Ct. App. 1992). And while the *Gaillard* case is factually similar in some respects, we do not find its reasoning persuasive. The district court in this case found no gross negligence on the part of the Arcadian board, and our court is less willing than California courts to question a corporate board's business judgment. *Cf. Priddy v. Edelman*, 883 F.2d 438, 443-44 (6th Cir. 1989). PCS cites our decision in *Buckhorn* as precedent striking down golden parachutes, but that case involved defensive measures to ward off a takeover, measures that failed to take shareholder interests into consideration, and an affirmation of the district court in a memorandum opinion on appeal as not having been clearly erroneous. *See Buckhorn, Inc. v. Ropak Corp.*, 656 F. Supp. 209, 232-35 (S.D. Ohio), *aff'd mem.*, 815 F.2d 76 (6th Cir. 1987).

---

[6]Golden parachutes have also been defended as a means of compensating managers for their investments in firm-specific skills. *See* Daniel R. Fischel, *Organized Exchanges and the Regulation of Dual Class Common Stock*, 54 U. Chi. L. Rev 119, 137-38 (1987); John C. Coffee, Jr., *Shareholders Versus Managers*, 85 Mich. L. Rev. at 76.

(Del. Ch. 1988); *Worth v. Huntington Bancshares, Inc.*, 540 N.E.2d 249, 255 (Ohio 1989).

PCS further argues that these golden parachutes violate public policy because they were approved after the merger had been approved, and therefore served no legitimate corporate purpose.[5] Though adopted after the merger was approved, these golden parachutes were authorized later in the same meeting at which the approval occurred. Thus, PCS's argument that their adoption violated public policy because it came after approval of the merger is somewhat misleading. Moreover, the timing of the adoption of the golden parachute provision fits with the rationale given for their adoption in deposition testimony by Arcadian's then-directors. With a merger pending, the company feared that its top personnel might seek lucrative offers elsewhere. Not only would the company then be deprived of the services of key employees in the interim (and potentially receive less value from a merger if the firm suffered from poor management just prior to closing), but it also risked no longer having the managers who had brought so much profit to Arcadian in the event that the merger was never consummated. To ensure that neither of those situations occurred, Arcadian used golden parachutes to entice nine of its top executives to remain with the company until and unless there was both a change of corporate control and a decline in those executives' respective positions in the company. Five managers stayed with the

---

[5] Commentators originally objected to the use of golden parachutes as anti-takeover devices where they were crafted as poison pills and triggered automatically by the single trigger of a change in corporate control. More recently, commentators have noted the potential moral hazard entailed by golden parachutes, inasmuch as they may encourage inefficient management to induce a takeover that is lucrative for departing managers. The golden parachutes here were adopted after approval of the merger, so neither of these objections can be made against them. Moreover, they required two triggering events, as termination or a role reduction had to accompany a change in control before the golden parachutes could be demanded. Thus, activation of the parachutes was within PCS's control.

PCS did not resolve the severance issue with Arcadian prior to the time when closing was imminent does not make Arcadian's insistence upon resolving the issue before closing the merger a hold-up.

Having disposed of the duress argument, there remains a controversy over consideration. The district court, as PCS notes, gave only the most cursory attention to the question in finding that there was consideration for the assumption agreement, for the reasons stated in the executives' brief to the court. Although we agree that there was adequate consideration to support a contract, the question deserves more careful attention. As an initial matter, we note that on appeal plaintiffs argue that closing the merger earlier than the April 30 financing deadline provided consideration. Despite representations made at oral argument, it does not appear that that argument was presented to the district court below, and we will not consider it.

One possibility for contract consideration is that the merger itself provided it. Because the executives' employment agreements with Arcadian, which required the assumption agreement, were approved on the same day as the merger, and because Arcadian then obtained the required assumption agreement prior to closing, we are inclined to see the assumption agreement as part and parcel of the merger agreement and not as a separate agreement needing separate consideration. PCS cites case law holding that separate consideration is needed for a modification to an existing contract; however, Paragraph 8.02 of the merger agreement stated that "after approval of this Agreement by the stockholders of Arcadian and prior to the [closing], this Agreement may be amended or supplemented in writing by PCS, Merger Sub, and Arcadian with respect to any of the terms contained in this Agreement . . . ." Under the facts of this case, we hold the assumption agreement fits within this description, is not a modification to a pre-existing contract, and is thus valid without any consideration beyond that inherent in the merger itself.

Plaintiffs argue that additional consideration exists anyway in the form of settling a bona fide dispute, avoiding delay in the merger, and averting the cost to PCS of automatically triggering the golden parachutes (of all nine Arcadian executives) upon failure to get a signed assumption agreement. Moreover, Arcadian claims it will have detrimentally relied on the validity of the assumption agreement in closing the merger if the assumption agreement is voided after the fact for lack of consideration. PCS responds that it received no benefit because appellees forebore a non-existent right and therefore suffered no detriment. Furthermore, argues PCS, since it was not the successor, there was no bona fide dispute between it and Arcadian, and the absence of its signature on the assumption agreement would not have entitled plaintiffs to deploy their parachutes. It is possible that PCS was an indirect successor, as the sole owner of the PCS Nitrogen subsidiary, and thus the consideration admittedly sufficient for PCS Nitrogen applies equally to PCS. We decline to address these additional issues, however, because whether or not PCS was obligated to sign the assumption agreement by the terms of the employment agreement between Arcadian and the plaintiffs (i.e., whether or not the lack of PCS's signature would have triggered the plaintiffs' parachutes), PCS elected to sign it and its signature on the assumption agreement binds it.

Another source of consideration upon which the district court may have relied is the executives' status as third-party beneficiaries under the assumption agreement. As an agreement signed by PCS, PCS Nitrogen, and Arcadian, under which PCS assumes some obligations belonging to its subsidiary, the executives purport to have standing as beneficiaries to enforce the agreement. Though we recognize this possibility, we hold that consideration exists for the other reasons stated.

## IV

PCS next argues that the golden parachutes violate public policy, and therefore that the assumption agreement promising them is void.[4] PCS advances this argument even though it offers golden parachutes to its own top managers. Hypocrisy aside, PCS cites no circuit case law supporting its proposition. At most this court has frowned on golden parachutes in past dicta, but we have never held that such severance packages are *per se* unlawful. *See Brown v. Ferro Corp.*, 763 F.2d at 800-01. Nor does PCS provide much reason to equate this type of executive compensation with contracts prohibited by public policy, such as ones to perform illegal acts. PCS cites a Congressional committee report saying that golden parachutes should be discouraged and notes that there is a heavy excise tax on parachutes over a certain value (exceeded here), but, as Plaintiffs point out, Congress taxed golden parachutes, it did not prohibit them. PCS further argues that these particular golden parachutes violate public policy because they are excessive and have a gross-up feature to compensate the recipient for any tax penalty. These features do not make the golden parachutes violative of public policy, and parachutes with such features have been upheld. *See Tate & Lyle PLC v. Staley Continental, Inc.*, Civ. A. No. 9813, 1988 WL 46064, at *7

---

[4]There is a rich, albeit somewhat dated, secondary literature discussing the pros and cons of golden parachutes. Whatever else might be gleaned from this material, golden parachutes are not uniformly condemned as offensive to public policy. *See, e.g.*, Kenneth Johnson, Note, *Golden Parachutes and the Business Judgment Rule: Toward a Proper Standard of Review*, 94 Yale L.J. 909 (1985); John C. Coffee, Jr., *Shareholders Versus Managers: The Strain in the Corporate Web*, 85 Mich. L. Rev. 1, 76 (1986); Ann Marie Hanrahan, Note, Koenings v. Joseph Schlitz Brewing Co.: *The Wisconsin Supreme Court Addresses Executive Termination Benefits in a Golden Parachute Contract*, 1987 Wis. L. Rev. 823; Richard P. Bress, Comment, *Golden Parachutes: Untangling the Ripcords*, 39 Stan. L. Rev. 955 (1987); Drew H. Campbell, Note, *Golden Parachutes: Common Sense From the Common Law*, 51 Ohio St. L.J. 279 (1990).